1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT

9                     FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11    ANGEL M. GARZA,                           No.  1:23-cv-01723-JLT-SKO (HC)

12                    Petitioner,               **FINDINGS AND RECOMMENDATION
                                                TO DENY PETITION FOR WRIT OF
13          v.                                  HABEAS CORPUS**

14    TAMMY CAMPBELL,                           **[21-DAY OBJECTION DEADLINE]**

15                    Respondent.

16

17          Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus

18    pursuant to 28 U.S.C. § 2254.  This matter was referred to the undersigned pursuant to 28 U.S.C.

19    § 636(b)(1)(B) and Local Rule 302.  As discussed below, the Court finds the petition to be

20    without merit and recommends it be **DENIED.**

21    **I.      PROCEDURAL HISTORY**

22          On January 12, 2018, a Kings County jury found Petitioner guilty of 14 felonies involving

23    molestation of his young daughter over a three-year period. (Doc. 34-47 at 1-6.[1])  Petitioner was

24    sentenced to an indeterminate prison term of 55 years to life for committing sodomy on a child

25    under 10 years old, and he was sentenced to a determinate term of 127 years and six months for

26    the remaining sex offenses. On January 26, 2023, the California Court of Appeal modified the

27    _____

28    [1] Citations are to ECF pagination unless otherwise noted.

1 determinate sentence to 88 years and eight months and affirmed the judgment. (Doc. 34-46.)

2 Petitioner then petitioned for review in the California Supreme Court. (Doc. 34-48.) On

3 April 12, 2023, the California Supreme Court summarily denied review. (Doc. 34-49.) Petitioner

4 filed a habeas petition in the California Court of Appeal on August 16, 2023. (Doc. 34-50.) The

5 petition was denied on October 26, 2023. (Doc. 34-51.)

6 On December 15, 2023, Petitioner filed a petition for writ of habeas corpus in this Court.

7 (Doc. 1.) Respondent filed an answer on August 19, 2024. (Doc. 35.) Petitioner filed a traverse

8 on March 7, 2025. (Doc. 54.)

9 **II.    FACTUAL BACKGROUND[2]**

10 **A. Petitioner's Unlawful Behavior with Jane Doe**

11 Jane Doe, who was born in June 2001, was 16 years old when she testified at trial.

12 Petitioner is her father. In general, Doe established that Petitioner engaged in lewd acts with her,

13 including vaginal and anal intercourse, over a three-year period starting when she was 10 years

14 old and ending when she was 13 years old. She related to the jury the specific incidents that she

15 best remembered, which we summarize.

16 **1. The "R & N Market" incident (counts 7-9)**

17 The first criminal incident did not involve sex, and it occurred when Doe was 10 years

18 old. On July 1, 2011, Petitioner asked Doe to drive with him to the "R & N Market" (R & N

19 Market incident). This store was close to their residence, only a few blocks away. Petitioner did

20 not promise her anything, but Doe testified that, based on past occurrences, it was very likely she

21 would have received a treat—such as candy or a toy—if she went with him. She did not feel

22 forced or pressured to go.

23 *a. Petitioner tells Doe to remove her pants*

24 Instead of driving to the market, Petitioner drove Doe to a rural location in Kings County

25 near an orchard. Petitioner parked. While they were inside the vehicle, Petitioner told her to take

26 _____

27 [2] The Fifth DCA's summary of facts in its unpublished opinion is presumed correct. 28 U.S.C. §§ 2254(d)(2), (e)(1). Therefore, the Court will rely on the Fifth DCA's summary of the facts in <u>People v. Garza</u>, 2023 WL 415659, at *1-6 (Cal. Ct. App. 2023). <u>See</u> <u>Moses v. Payne</u>, 555 F.3d 742, 746 (9th Cir. 2009).

28

1   off her capri pants. Doe told the jury that she was "confused" and "scared" when Petitioner

2   directed her to remove her pants. She said she was confused because that was not a "normal

3   question" for a father to ask his daughter, and "that is not something dads are supposed to do."

4   She testified that she unbuttoned her pants and pulled them down.

5        A sheriff's deputy happened to drive past the parked vehicle, and he stopped near it to

6   investigate. He did not initially see anyone inside but, as he drove up to it, he saw both Doe's and

7   Petitioner's heads "pop up" from the front seats. Doe was in the driver's seat and Petitioner was

8   in the front passenger seat. Law enforcement later realized that both of those seats were fully

9   reclined, and no groceries were in the vehicle.

10       The deputy saw Doe "shimmying her shoulders and torso in the same fashion you would

11  when you're putting your pants on." When he stood next to the vehicle, the deputy saw that both

12  Doe and Petitioner were fully dressed, but Doe's pants were unbuttoned.

13       The deputy spoke with Petitioner outside the vehicle.[3] At some point, the deputy walked

14  back to his patrol vehicle and Petitioner looked at Doe through the window of their car. He told

15  Doe that she had "better not say anything." She felt scared when he said that, and she told the jury

16  that Petitioner said it with "a mean face." She explained at trial that she was scared because

17  Petitioner "is a scary person." She later testified that she was scared because Petitioner had been

18  "violent towards my mom, and my brothers, and me."

19       At the scene with the deputy, Petitioner reported that Doe's mother had spanked Doe and

20  left a bruise on her buttocks. Petitioner claimed he had been checking that bruise when the deputy

21  had arrived. The deputy asked why he was doing that at this location, and Petitioner "never really

22  gave a reason."

23       In contrast, Doe informed the deputy that her pants were tight, and Petitioner had been

24  checking their size. According to the deputy, she did not appear upset or distraught.

25  Petitioner was not arrested that night but law enforcement officials separately interviewed

26  Petitioner and Doe at the sheriff's office regarding the circumstances. They provided conflicting

27

28
_____
[3] The deputy testified that he recognized Petitioner once Petitioner stepped out and they met at the rear of
Petitioner's vehicle. The deputy did not explain to the jury how or why he knew Petitioner.

1  accounts of what had occurred.

2  *b. Doe's statements to law enforcement that night*

3  Doe told the jury that she did not tell officials the truth that night when she was asked

4  what had happened. At the sheriff's office, she falsely stated that she had been in the driver's seat

5  looking for Petitioner's cell phone. She also said her pants had been too tight, and she had a

6  stomachache. She claimed that Petitioner had told her to unbutton her pants to help with her

7  stomachache. She also mentioned a bruise on the back part of her leg that Petitioner had wanted

8  to see. Doe said she had received a bruise a few days before at school from falling off a bench.

9  Doe was wearing "Jean capris" when this incident occurred. Although Doe had claimed that her

10  pants were too tight, an interviewing deputy noticed that she wore a belt around her pants, and her

11  pants seemed loose and one size too big. At the sheriff's office, Doe tried to roll up the capris to

12  show the bruise, but the pants would not roll up high enough. Doe showed a female detective the

13  bruise on her upper thigh. Doe had to pull down her pants to expose the bruise, which was about

14  the size of a quarter.

15  During her interview at the sheriff's office, Doe denied that anyone, including Petitioner,

16  had ever touched her inappropriately. Doe said that her relationship with Petitioner was good, she

17  loved him, and she liked spending time with him. She reported that, if someone did touch her

18  inappropriately, she would tell her parents. A deputy noticed that Doe would change the subject

19  or look down when this incident was brought up.

20  *c. Petitioner's statements to law enforcement that night and CPS's plan*

21  Petitioner told a detective that night that Doe pulled down her pants so he could see her

22  bruise. Petitioner had claimed that Doe's mother, his then estranged wife, had spanked Doe and

23  left a mark. According to Petitioner, Doe was showing him the bruise when the deputy pulled

24  alongside their parked vehicle.

25  Child protective services (CPS) was involved in law enforcement's investigation of this

26  incident. Although Doe never indicated she had been touched in a sexual manner, CPS

27  implemented "a safety plan" in which Petitioner voluntarily agreed to stay away from Doe for an

28  unspecified time. That safety plan was discussed with the family, including Doe's mother. It did

4

1    not appear to CPS that Petitioner was living with Doe when this incident occurred.

2    *d. Doe informed the jury that Petitioner did not want to see her bruise*

3    At trial, Doe confirmed that Petitioner had not touched her sexually during this incident.

4    She estimated that she had her pants unbuttoned for about 10 minutes before the deputy arrived.

5    She also confirmed at trial that she did have a bruise on her left thigh when this incident occurred.

6    She received the bruise after falling at school. She told the jury that, on the day she got the bruise,

7    Petitioner had picked her up from school, and she had told him about it. That was a different day

8    than the R & N Market incident.

9    During her trial testimony, Doe agreed that she had been talking with Petitioner about her

10    bruise while they were driving to the market, and her stomach was hurting at that time. However,

11    she denied that Petitioner had asked to see her bruise when he told her to remove her pants.

12    **2. The "living room" incident (counts 1-3)**

13    Doe testified that Petitioner had vaginal sex with her in 2011 when she was 10 years old.[4]

14    This incident occurred at night in their living room when her mother was at work (the living room

15    incident). Doe testified she was in pain and crying, and told the jury she believed this incident

16    lasted more than an hour.

17    During this incident, Doe's two younger brothers had been present in the house in the

18    bedroom they shared with Doe. At time of trial, her brothers were 14 and 10 years old, which

19    would have made them approximately eight and four years old, respectively, when this incident

20    occurred. Doe never told her mother or her brothers what had happened. Doe explained that she

21    did not report this incident to her mother because Petitioner had hit her, and he kept saying she

22    had "better not tell" or Doe would never see her mother again.

23    Doe testified that, after the first incident of sex, other incidents occurred "multiple times."

24    She stated that Petitioner sometimes gave her a pain pill after he had sex with her.

25    _____

26    [4] During her initial trial testimony, Doe had said that this living room incident happened when she was 10 or 11 years old. During rebuttal testimony, however, Doe clarified that she was 10 years old when this first

27    incident of sex had occurred, and she was "positive" that she had been 10 years old. She explained that, although she had previously been unsure about her age, she had reviewed a calendar and realized she had

28    been 10 years old when this occurred because she had started summer school when she was around 10 years old, and she was 10 years old entering the fifth grade.

### 3. The "choking" incident (counts 13 and 14)

Sometime after the living room incident, and when Doe was 11 or 12 years old, Petitioner called her to the bedroom that she shared with her brothers. Doe resisted him and he grabbed her arm. She tried to pull away, but he hit her arm. She was crying and said she was going to tell her mother. She got to the bedroom door, but he pushed her to the ground and he choked her with both hands wrapped around her throat (the choking incident). Petitioner kept saying that she had "better not tell" her mother. Doe did not black out or lose consciousness. Her clothes were on during this incident, and he did not have sex with her on this occasion.

### 4.. The "carrying" incident (counts 11 and 12)

When Doe was 13 years old or younger, she was asleep one night and Petitioner carried her into the living room (the carrying incident). Her brothers were in the bedroom from where Petitioner had picked her up. The lights were off in the house and her mother was gone. Petitioner kept telling her, "[S]hush." He removed his clothes and her clothes. Once naked, he did the "same thing as always." He placed his penis inside her vagina. She thought it lasted more than an hour, maybe two hours.

She testified that she was "crying and moving." He told her that the longer she took, the longer she would have to be there. She was hurting, tired, sad and scared. She tried to push him away. He was mad, and he looked at her "all mean." He would get irritated, would not let her go to sleep and held down her arms.

### 5. The "final" incident involving sodomy (counts 5, 6, 15 & 17)

Doe testified that the final incident with Petitioner occurred when she was 13 years old (the final incident). Her brothers were in the living room and her mother was elsewhere. Petitioner called Doe to her bedroom, and he locked the door behind her. He told her to lie down on the carpet. He pulled down her pants and he pushed his penis inside her "butt hole." She was crying and it hurt. Petitioner eventually said, "[F]ine," and he told her to lie on her back. He then had vaginal sex with her. She was in pain. She wanted to return to the living room, but he told her to wait, and she could go "in a minute." Petitioner was interrupted when one of Doe's brothers knocked on the bedroom door.

Doe testified that, at some point after this incident, her brother reported the situation to her mother. Her mother confronted Doe and asked if Petitioner had locked her in the room with him. When Doe said yes, her mother asked her why she had not told her. Doe said that Petitioner had told her not to say anything. Doe's mother left that day with the children, and they stayed with Doe's aunt.

**C. Doe Discloses Petitioner's Criminal Behavior to Law Enforcement**

Doe did not tell her mother or brothers what had happened inside the locked bedroom during the final incident. However, her mother had her speak with a former police officer, Donovan Sizemore. Doe's mother told Sizemore that she was concerned Petitioner may have molested Doe. Doe met with Sizemore, and she admitted to him about some of the abuse she had suffered from Petitioner. Sizemore reported the information to the Kings County Sheriff's Department.

Doe testified at trial that, before she had agreed to speak with Sizemore, a family friend had reported seeing Petitioner in a nearby town, where Doe, her mother and her brothers had relocated after the final incident. Doe felt scared and was worried that Petitioner might go to her grandmother's residence and take one of her brothers. She panicked and told her mother that day that she did not want Petitioner to hurt them. She agreed to talk to someone about what had happened.

On or about April 27, 2016, a detective, Dakota Fausnett, interviewed Doe. Doe reported to Fausnett that Petitioner had inappropriately touched her and had sex with her. She made it clear that Petitioner had placed his penis inside her vagina. Doe disclosed to Fausnett that her mother was ill, and Doe was in fear of having to again live with Petitioner.

Fausnett explained to the jury that, at the time he learned of the sexual abuse allegations, Petitioner's last sexual contact with Doe had occurred about two years earlier. Fausnett told the jury that Doe had described everything to him that she had testified about in court. She had reported that Petitioner gave her pain pills after "most" encounters. Doe reported to Fausnett that Petitioner had been with her inappropriately about 50 times.

1    Fausnett arranged for Doe to undergo an MDIC interview, which Fausnett observed.[5]

2    During both her interview with him and during the MDIC interview, Doe reported over 50

3    inappropriate contacts with Petitioner. She said it did not occur every night, but it was most

4    nights. She later said it was over 50 times.

5    At trial, Doe explained that, around the time she disclosed information to Fausnett, she

6    had been worried that she might have to live with Petitioner. She was concerned that Petitioner

7    "would probably hurt me some more or something." Doe agreed in court that she had told

8    Fausnett that Petitioner had done this at least 100 times with her, but she denied saying it

9    happened more than 150 times.

10    **C. Petitioner's Interview with Fausnett**

11    In May 2016, Fausnett interviewed Petitioner at the sheriff's office regarding Doe's

12    allegations. Petitioner denied everything. He said he had never raped Doe, and he had a good

13    relationship with her. Petitioner claimed that Kings County was out to get him, the allegations

14    against him were false, and Doe's mother was trying to "set him up."

15    Regarding the R & N Market incident from 2011, Petitioner said he had "already beat it."

16    According to Petitioner, those were false allegations, and nothing had happened. Petitioner

17    claimed that he and Doe had gone to the market that night, and Doe had told him about her

18    mother spanking her, both before and after leaving the market. Petitioner stated that he had

19    wanted to see Doe's bruise. However, he could not elaborate on why they were at that specific

20    location to inspect the bruise. Petitioner said he had called Doe's mother and was outside the

21    vehicle so that Doe would not hear them arguing. He got in and told Doe to pull down her pants

22    to see the bruise. The deputy then arrived.

23    Fausnett asked Petitioner about the reclined seats, and Petitioner could not explain why

24    the seats had been reclined during that incident. Petitioner said that Doe's mother was trying to

25    set him up for previous charges, criminal threats, and "domestic violence." Petitioner believed

26    Doe's mother was trying to have him killed.

27

28    _____

[5] Fausnett explained that "MDIC" stood for a multi-disciplinary interview center.

**D. The Defense Evidence**

Petitioner did not testify. He called several witnesses on his behalf, including a nurse practitioner who had examined Doe in April 2014. At the time of that examination, Doe was 12 years old and she was complaining of acne and irregular menstruation. The nurse practitioner is a mandatory reporter of sexual abuse or assault. She did not question Doe directly about whether she was suffering abuse, and she did not vaginally examine Doe. Instead, the visit was mostly for acne and the nurse practitioner did not notice anything during this visit that suggested Doe was suffering from abuse. Doe's demeanor appeared normal. The nurse practitioner denied noting any bruising or marks around Doe's face or neck.

**E. Rebuttal Testimony Regarding Child Sexual Abuse Accommodation Syndrome**

After the defense rested, the prosecution called some rebuttal witnesses, including Anthony Urquiza. Urquiza informed the jury about child sexual abuse accommodation syndrome (CSAAS), which identifies trends regarding how children tend to disclose prior sexual abuse. Urquiza made it clear that he had neither evaluated nor spoken with Doe.

Urquiza explained at length regarding the characteristics that make up CSAAS. He testified that most children have a "significant delay" in reporting sexual abuse. It is often months or years before a child victim is able to disclose.

**III.    DISCUSSION**

A.    Jurisdiction

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution, laws, or treaties of the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375 n. 7 (2000).  Petitioner asserts that he suffered violations of his rights as guaranteed by the United States Constitution.  The challenged conviction arises out of the Kings County Superior Court, which is located within the jurisdiction of this court.  28 U.S.C. § 2254(a); 28 U.S.C.§ 2241(d).

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its

9

1    enactment.  Lindh v. Murphy, 521 U.S. 320 (1997) (holding the AEDPA only applicable to cases

2    filed after statute's enactment).  The instant petition was filed after the enactment of the AEDPA

3    and is therefore governed by its provisions.

4          B.       Legal Standard of Review

5          A petition for writ of habeas corpus under 28 U.S.C. § 2254(d) will not be granted unless

6    the petitioner can show that the state court's adjudication of his claim: (1) resulted in a decision

7    that was contrary to, or involved an unreasonable application of, clearly established Federal law,

8    as determined by the Supreme Court of the United States; or (2) resulted in a decision that "was

9    based on an unreasonable determination of the facts in light of the evidence presented in the State

10   court proceeding."  28 U.S.C. § 2254(d); Lockyer v. Andrade, 538 U.S. 63, 70-71 (2003);

11   Williams, 529 U.S. at 412-413.

12         Under Section 2254(d)(1), a state court decision is "contrary to" clearly established

13   federal law "if it applies a rule that contradicts the governing law set forth in [the Supreme

14   Court's] cases, or "if it confronts a set of facts that is materially indistinguishable from a

15   [Supreme Court] decision but reaches a different result."  Brown v. Payton, 544 U.S. 133, 141

16   (2005) (citing Williams, 529 U.S. at 405-406).  This court looks to "Supreme Court holdings at

17   the time of the state court's last reasoned decision" as "the source of clearly established Federal

18   law for the purposes of AEDPA." Barker v. Fleming, 423 F.3d 1085, 1093 (9th Cir. 2005). A

19   Supreme Court precedent is not clearly established law under section 2254(d)(1) unless the Court

20   "squarely addresses the issue" in the case before the state court. Wright v. Van Patten, 552 U.S.

21   120, 125–26 (2008) (per curiam) (concluding that a state court had not unreasonably applied

22   federal law to a claim of prejudice under Strickland where the logic of petitioner's argument

23   would have required the extension of the Supreme Court's inherent prejudice doctrine to a new

24   context); Carey v. Musladin, 549 U.S. 70, 76–77 (2006) (same). While "[c]ertain principles are

25   fundamental enough that when new factual permutations arise, the necessity to apply the earlier

26   rule will be beyond doubt," Yarborough v. Alvarado, 541 U.S. 652, 666 (2004), "when a state

27   court may draw a principled distinction between the case before it and Supreme Court caselaw,

28   the law is not clearly established for the state-court case." Murdoch v. Castro, 609 F.3d 983, 991

1   (9th Cir. 2010). "'[I]f a habeas court must extend a rationale before it can apply to the facts at

2   hand,' then by definition the rationale was not 'clearly established at the time of the state court

3   decision.'" White v. Woodall, 572 U.S. 415, 426 (2014) (quoting Yarborough, 541 U.S. at 666).

4          In Harrington v. Richter, 562 U.S. 86, 101 (2011), the U.S. Supreme Court explained that

5   an "unreasonable application" of federal law is an objective test that turns on "whether it is

6   possible that fairminded jurists could disagree" that the state court decision meets the standards

7   set forth in the AEDPA. The Supreme Court has "said time and again that 'an unreasonable

8   application of federal law is different from an incorrect application of federal law.'" Cullen v.

9   Pinholster, 563 U.S. 170, 203 (2011). The petitioner "must show far more than that the state

10  court's decision was 'merely wrong' or 'even clear error.'" Shinn v. Kayer, 592 U.S. 111, 118

11  (2020) (quoting Virginia v. LeBlanc, 582 U. S. 91, 93 (2017) (per curiam)). Rather, a state

12  prisoner seeking a writ of habeas corpus from a federal court "must show that the state court's

13  ruling on the claim being presented in federal court was so lacking in justification that there was

14  an error well understood and comprehended in existing law *beyond any possibility of fairminded*

15  *disagreement*." Richter, 562 U.S. at 103 (emphasis added); see also Kayer, 592 U.S. at 118. In

16  other words, so long as fairminded jurists could disagree with each other as to whether the state

17  court was correct, the state court decision is not unreasonable under AEDPA. Congress "meant"

18  this standard to be "difficult to meet." Richter, 562 U.S. at 102.

19         Section 2254(d)(2) pertains to state court decisions based on factual findings. Davis v.

20  Woodford, 384 F.3d 628, 637 (9th Cir. 2003) (citing Miller-El v. Cockrell, 537 U.S. 322 (2003)).

21  Under § 2254(d)(2), a federal court may grant habeas relief if a state court's adjudication of the

22  petitioner's claims "resulted in a decision that was based on an unreasonable determination of the

23  facts in light of the evidence presented in the State court proceeding." Wiggins v. Smith, 539

24  U.S. 510, 520 (2003); Jeffries v. Wood, 114 F.3d 1484, 1500 (9th Cir. 1997). The federal habeas

25  court must give "substantial deference" to the state court. Brumfield v. Cain, 576 U.S. 305, 314

26  (2015). "Factual determinations by state courts are presumed correct" and the petitioner bears the

27  burden of overcoming the presumption with "clear and convincing evidence to the contrary."

28  Miller-El, 537 U.S. at 340; 28 U.S.C. § 2254(e)(1). A state court's factual finding is unreasonable

1    when it is "so clearly incorrect that it would not be debatable among reasonable jurists." <u>Jeffries</u>,

2    114 F.3d at 1500; <u>see</u> <u>Taylor v. Maddox</u>, 366 F.3d 992, 999-1001 (9th Cir. 2004), *cert. denied*,

3    <u>Maddox v. Taylor</u>, 543 U.S. 1038 (2004).  If "'[r]easonable minds reviewing the record might

4    disagree' about the finding in question, '. . . that does not suffice'" to prove the lower court's

5    factual determination was unreasonable. <u>Wood v. Allen</u>, 558 U.S. 290, 301 (2010) (alteration in

6    original) (quoting <u>Williams v. Taylor</u>, 529 U.S. 362, 410 (2000)).

7         To determine whether habeas relief is available under § 2254(d), the federal court looks to

8    the last reasoned state court decision as the basis of the state court's decision.  <u>See</u> <u>Ylst v.</u>

9    <u>Nunnemaker</u>, 501 U.S. 979, 803 (1991); <u>Andrews v. Davis</u>, 994 F.3d 1042, 1107 (9th Cir. 2019)

10   (en banc).  "[A]lthough we independently review the record, we still defer to the state court's

11   ultimate decisions."  <u>Pirtle v. Morgan</u>, 313 F.3d 1160, 1167 (9th Cir. 2002).

12        The prejudicial impact of any constitutional error is assessed by asking whether the error

13   had "a substantial and injurious effect or influence in determining the jury's verdict." <u>Brecht v.</u>

14   <u>Abrahamson</u>, 507 U.S. 619, 623 (1993); <u>see also</u> <u>Fry v. Pliler</u>, 551 U.S. 112, 119-120 (2007)

15   (holding that the <u>Brecht</u> standard applies whether or not the state court recognized the error and

16   reviewed it for harmlessness).

17        C.    <u>Review of Petition</u>

18        Petitioner presents the following nine (9) grounds for relief: 1) The trial court erred by

19   denying defense counsel's motion to withdraw due to an alleged conflict; 2) Defense counsel

20   rendered ineffective assistance by failing to produce an expert witness; 3) Defense counsel

21   rendered ineffective assistance by failing to object to prior bad acts testimony; 4) Petitioner's

22   Fifth Amendment rights were violated when the jury discussed the fact Petitioner had not

23   testified; 5) Petitioner's rights were violated when the trial court allowed the sexual abuse expert

24   to use case specific information; 6) The trial court erred by allowing the prosecutor to introduce a

25   new theory of liability; 7) The trial court erred by instructing the jury with CALCRIM No. 1193;

26   8) The evidence was insufficient to support the multiple counts; and 9) Petitioner's sentence

27   constitutes cruel and unusual punishment in violation of the Constitution.

28

1            1.   Claim One

2    Petitioner alleges the trial court erred when it denied defense counsel's motion to

3    withdraw due to a declared conflict.  Petitioner raised this claim on direct appeal.  In the last

4    reasoned decision, the appellate court denied the claim as follows:

5        On November 21, 2017, with the trial then set to start in a matter of days,
     appellant's appointed trial counsel, Peter Zerbib, filed a motion seeking to

6    withdraw his representation. Zerbib raised an alleged conflict of interest as the
     grounds for withdrawal. After conducting an extensive inquiry, the court denied

7    the motion.

8        On December 14, 2017, Zerbib again requested to withdraw his representation
     based on an alleged conflict of interest. The court again denied that request after

9    conducting another extensive hearing. The trial eventually commenced on January
     8, 2018.

10       Appellant argues that the trial court erred when it failed to grant Zerbib's motion to

11   withdraw. He seeks reversal of all of his convictions.

12         ***A. Background.***

13       We summarize the two hearings wherein Zerbib sought to withdraw his
     representation in this matter. We also summarize other relevant instances wherein

14   Zerbib discussed with the court his desire to withdraw.

15          ***1.   The November 21, 2017, request to withdraw.***

16       On November 21, 2017, a trial confirmation hearing occurred. The prosecution
     declared that it was ready to proceed to trial. Zerbib, however, declared a conflict

17   of interest regarding his representation of appellant. Zerbib stated that he could not
     discuss the conflict without violating the attorney-client privilege. The court had

18   the courtroom cleared and a closed confidential hearing occurred.

19       Once the courtroom was cleared, the court asked Zerbib to describe the "nature" of
     the alleged conflict. Zerbib stated he was willing to discuss it if appellant waived

20   the attorney-client privilege, and he said "a conflict has arisen in my ability to
     adequately represent [appellant]." The court noted that, at that time, the trial was

21   scheduled to start in a "couple days" and the court needed to have a better idea
     about the nature of the conflict. Zerbib said he believed case law existed that held

22   he did not need to state the reasons for the alleged conflict on the record, but he
     had not been able to locate those opinions. Zerbib explained that he could not

23   effectively represent appellant.

24       The court stated it needed something more, and Zerbib responded that he was not
     at liberty to disclose more without appellant waiving the attorney-client privilege.

25   The court stated it was unable to evaluate whether or not a conflict of interest
     existed, and the court expressed concern that this could be an issue generated by

26   appellant "simply to avoid trial this coming Monday." Zerbib disclosed that he had
     not informed appellant that he was going to declare a conflict of interest.

27

28       The court asked appellant if he wanted Zerbib removed. Appellant stated that he
     did not know anything about this issue. Appellant described some concerns he had

                                        13

about Zerbib's preparation for trial, but he emphasized that he wanted him to remain.

The court again asked Zerbib to "label" the conflict, and Zerbib responded it was "threats of complaints to the [S]tate [B]ar as to representation." He explained that, through the jail, he had been advised that appellant may have already notified the State Bar about allegations against him. The court responded that it did not believe such complaints necessarily created a conflict of interest, especially because appellant still wanted Zerbib to represent him.

Appellant explained to the court that he had drafted a letter the day before to the State Bar, and appellant assumed that Zerbib had learned about that letter from jail officials. The court asked Zerbib if anything else needed to be put on the record, and Zerbib reiterated his belief that a conflict still existed regarding his ability to represent appellant adequately. He believed his ability to represent appellant had been impacted and he could not continue.

The court noted that only a grievance had been sent to the State Bar, and the court asked if there was anything else. The court told Zerbib that he could not "hide the ball" and he had to tell the court "at least a label or something that I can start to understand what your conflict is." Zerbib responded that he and appellant were at a "discord" and he could not present appellant's case. The court, however, noted that appellant wanted Zerbib to continue representing him.

Zerbib indicated to the court that he was not able to communicate with appellant, and their breakdown occurred during their conversations and some letters appellant had sent to him. The court responded that those examples actually showed that they were communicating. The court also noted that appellant wanted Zerbib to continue representing him. The court informed Zerbib that, unless he could show something else, Zerbib would not be relieved as counsel over appellant's apparent objection, especially on the (then) eve of trial.

Zerbib stated that, because this was a life case, he was "declaring a conflict" and he did not feel that he could effectively represent appellant if trial proceeded on Monday because of their "communication failure." The court responded that appellant was not reporting any communication problems, and the court did not understand the alleged problem in communication. The court noted that the representation might be difficult because they disagreed on trial tactics, but the court did not see a legal or ethical basis to remove Zerbib from the case. The court said it was willing to listen to more, but there was not enough based on the current circumstances. The court concluded the confidential hearing.

Once the prosecutor was present, Zerbib indicated that the defense was not ready to proceed to trial because some additional investigation was needed, along with locating certain witnesses.

### 2. Zerbib's additional statements regarding withdrawing.

On November 21, 2017, shortly after the closed confidential hearing occurred that was summarized above, the defense asked for a trial continuance to conduct additional investigation and locate certain witnesses. During this exchange, the court questioned whether the defense had been diligent in interviewing a potential witness. The prosecutor stated her concern about a later possible claim of ineffective assistance of counsel on appeal, noting that Zerbib had declared a conflict and he was stating that he had not accomplished some things that were

14

necessary for trial. The prosecutor asked the court to either make a finding or appoint "standby counsel" to assist Zerbib if this trial went forward "to protect the People's appeal issues." The court responded that it had not found a conflict of interest, there was insufficient evidence to grant a continuance, and there were no other indications that Zerbib was not doing "a good and adequate job" in the representation.

While discussing grounds for a trial continuance, Zerbib mentioned that appellant was going to file a writ of habeas corpus with the appellate court, and appellant wanted the criminal proceedings stayed in the superior court. The anticipated writ was based on the prosecution's alleged failure to disclose Doe's medical records to appellant, which appellant contended were exculpatory and had prolonged his incarceration in jail. The court noted that this discovery issue had been previously addressed, and these medical records had been provided to the defense. The trial had been previously continued to give the defense sufficient time to prepare for trial. Appellant began to address the court directly, but the trial court asked Zerbib to articulate a legal basis for the court to do or not do something. Zerbib responded that this was, in part, why he had declared a conflict of interest, and he believed the court could declare a conflict based on his representation. Zerbib explained the basis for appellant's request to stay the criminal proceedings based on the prosecution's earlier failure to disclose Doe's medical records. The court stated it was not going to issue a stay of the proceedings because those records had been provided to the defense prior to the start of trial. The court then considered motions in limine.

Before the hearing regarding motions in limine concluded, Zerbib stated that he had located legal support for his request to withdraw. Citing the California Rules of Professional Conduct, former rule 3-700(B)(1), Zerbib stated that withdrawal is mandatory where an attorney knows or should know a client is bringing an action, conducting a defense, asserting a position in litigation, or taking an appeal without probable cause, but for the purpose of harassing or maliciously injuring a person. Zerbib stated that withdrawal was mandatory if a member of the State Bar knew or should have known that continued employment would result in a violation of these rules or of the State Bar Act. Even if not mandatory, an attorney could withdraw if he concludes that hostility between the client was such that he could not effectively continue to represent the client. The court responded that "none" of those issues had been shown. A short time later, Zerbib reiterated that he still felt a conflict existed. The court responded that it did not understand how Zerbib's cited authority had anything to do with the issue he had raised.

On November 27, 2017, the prosecutor requested a trial continuance because of witness unavailability. The court granted a trial continuance.

### 3. The December 14, 2017, request to withdraw.

On December 14, 2017, the court conducted another closed confidential hearing regarding Zerbib's renewed claim that a conflict of interest existed. Zerbib again declared a conflict of interest, stating there was a "complete breakdown" in the attorney-client relationship that impacted his ability to effectively represent appellant. The court noted that the last claimed conflict dealt with a report to the State Bar, which the court stated was insufficient to create a conflict. Appellant had previously wanted Zerbib to continue his representation, which is why the court previously denied the request to be relieved. The court asked if circumstances had changed.

15

Zerbib responded that the circumstances had not changed, but he had a case which he wanted the court to consider. Zerbib stated he was "stuck" because he could not divulge the conflict without violating appellant's rights to the attorney-client privilege. The court asked Zerbib to expand on his claim that there was a breakdown in communication. Zerbib cited *Aceves v. Superior Court* (1996) 51 Cal.App.4th 584 (*Aceves*), and stated that, based on his conversations with appellant over the past 16 months and the letters received from him, the attorney-client relationship had completely broken down. Zerbib believed he could not provide details because of his ethical obligations, which he described as placing him "in a box." The court stated that Zerbib needed to "find a way out of that box" because the court could not grant the request without more information.

The court asked appellant if he still wanted Zerbib to represent him. Appellant agreed, noting he had requested Zerbib to represent him in this matter because Zerbib had previously represented him in 2014. Appellant said he believed Zerbib was trying to create a conflict because Zerbib was going to start working for the district attorney's office once this case ended. Appellant expressed frustration that Zerbib was not visiting him in jail or responding to his request for certain motions to be filed. Appellant said he did not know anything about the state of his defense, and he thought Zerbib wanted him (appellant) to discharge him (Zerbib) through a *Marsden* [Fn.7] motion, which appellant was "not going to do." Appellant said that Zerbib was familiar with Doe. Appellant then stated his belief that Zerbib was really trying to "run" him over and "burn" him at trial because he was working with the district attorney's office.

[Fn.7] *People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden*).

The court asked appellant if he believed he could still communicate with Zerbib, and appellant said, "Yes, I can." Appellant, however, expressed frustration that Zerbib was not filing a particular writ for him, and there was a delay in Zerbib providing him with information. Appellant stated that Zerbib was doing all of this, but it was "better for me" and appellant believed he could win on appeal. Appellant said he did not believe Zerbib could provide him with a fair trial, but appellant wanted to keep him and he was "not going to fire him." The court told Zerbib that, because appellant still wanted the representation to continue, the court was not going to relieve him unless it had "something substantive" from him.

Zerbib reiterated his belief that, based on *Aceves*, he did not need to provide a specific reason for the stated conflict of interest if it would divulge client confidences or breach ethical duties. However, Zerbib did not know whether or not *Aceves* involved a situation where the client wanted the attorney to be relieved. The court expressed frustration because Zerbib was saying a breakdown in communication had occurred by virtue of their communications, but appellant was saying he could still communicate with Zerbib and he wanted the representation to continue. Zerbib commented that he had told appellant many months prior that he was going to work for the district attorney's office at the conclusion of this case.

The court asked appellant that, if appellant believed Zerbib was colluding with the district attorney against his interests, why did he want the relationship to continue. Appellant responded that he thought the district attorney wanted Zerbib to be replaced, which he was not going to permit. Appellant believed Zerbib was familiar with his situation, and he did not want to waste time with a new attorney learning the case. Appellant said he had a good working relationship with the investigator that the court had appointed for the defense.

16

The court informed Zerbib that it did not have a basis to relieve him over appellant's objection. Zerbib responded that he believed the relationship had broken down based on appellant's statements. Zerbib said he could not effectively represent appellant "because our relationship has had a complete breakdown."

The court countered that it did not sound like that. Instead, appellant was asking for Zerbib to visit him and discuss the case. Zerbib responded that appellant stated a number of different beliefs about his (Zerbib's) hope to work for the district attorney's office, and that providing a poor outcome in this case might be tied to an employment opportunity as a prosecutor. The court noted that, despite those concerns, appellant still wanted Zerbib to represent him. Zerbib clarified that he had previously advised appellant that he was seeking employment with the district attorney's office, but he did not want to start until this case was finished. Zerbib had informed appellant that no offer had been extended, and other people had been hired. [Fn.8] According to Zerbib, appellant still continued to believe that somehow he (Zerbib) will gain employment with the district attorney's office once this case is done. Zerbib noted that appellant believed the county was going to "railroad" him, and Zerbib was working with the prosecution against him.

> [Fn.8] According to the California State Bar's website, defense counsel was subsequently hired by the Kings County District Attorney's Office. Appellant has filed a request for judicial notice of that fact, and respondent did not file an objection to appellant's request. We hereby grant appellant's request for judicial notice. (Evid. Code, § 452, subd. (h) [a court may take judicial notice of facts "not reasonably subject to dispute" that are "capable of immediate and accurate determination" from a source "of reasonably indisputable accuracy"].)

The court asked Zerbib how this had prevented him from preparing the case. Zerbib stated he could no longer talk with appellant, who had a number of motions he wanted filed on his behalf. Zerbib said he could not communicate with him regarding those motions. When pressed for details, Zerbib said he had to assert the attorney-client privilege, and he was stuck in an "ethical box."

The court stated that nothing established grounds to relieve Zerbib over appellant's objection on the day of trial readiness. The court said it needed something "concrete." Zerbib again referred the court to *Aceves*. The court, however, stated that *Aceves* did not deal with a client objecting to the removal of representation. The court said that Zerbib did not have the right "to *Marsden* his client." The court asked Zerbib if grounds existed for a mandatory withdrawal. Zerbib responded that he could not provide that information without violating the attorney-client privilege. Zerbib believed that his representation was enough based on *Aceves* and various opinions from the State Bar.

The court stated that it would be different if appellant agreed that a breakdown in communication had occurred. However, appellant had stated the opposite and he wanted Zerbib to continue the representation because he had unique knowledge of the case, and Zerbib represented his best hope for a fair trial. The court stated that Zerbib's "vague references" were insufficient to grant a motion to withdraw. The court noted that this was a very complex case and a new attorney could not just take it over. The court said it was not going to relieve him over appellant's objection unless Zerbib could give more.

Zerbib responded that he had already stated why a breakdown had occurred. He noted that appellant had indicated he wanted the representation to continue, but

17

appellant also believed that Zerbib was working with the district attorney's office. Zerbib believed that appellant wanted the relationship to continue to have an issue for appeal. Zerbib said this had created a conflict, and it was a breakdown in their relationship.

The court thanked Zerbib for his comments, and the court denied the request to be relieved. The court stated that Zerbib could renew this request in the future if he had something "more concrete" to provide that would show a legal basis for removal in light of appellant's wishes.

### B. Standard of review.

An abuse of discretion standard is used to review a trial court's denial of a motion by an attorney to withdraw. (*People v. Hajek and Vo* (2014) 58 Cal.4th 1144, 1234, overruled on different grounds in *People v. Rangel* (2016) 62 Cal.4th 1192, 1216; *People v. Brown* (1988) 203 Cal.App.3d 1335, 1340.) Under an abuse standard, we will not disturb a lower court's ruling unless "'the court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice.'" (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1124–1125, quoting *People v. Jordan* (1986) 42 Cal.3d 308, 316.)

### C. Analysis.

Appellant asserts that the trial court erred when it failed to grant Zerbib's motion to withdraw in light of Zerbib's repeated representation that he had a conflict of interest, and that his relationship with appellant was irreparable. According to appellant, the court should have inquired more into the issue of Zerbib seeking employment with the prosecutor's office. Appellant contends that Zerbib's efforts to work for the district attorney was, without more, an apparent conflict of interest. Appellant maintains that Zerbib would have not wanted to "push too hard" for him for fear of losing an opportunity to work as a prosecutor, and he contends that Zerbib was in fact ineffective at trial. Appellant primarily relies on *People v. Jackson* (1985) 167 Cal.App.3d 829 (*Jackson*) to establish error, and he argues he has demonstrated an actual conflict that should have been the basis for discharging Zerbib prior to the commencement of trial.

Appellant's arguments are unpersuasive. The trial court did not abuse its discretion in denying the motion for Zerbib to withdraw.

A defendant's right to effective representation by counsel includes the right that no conflicts of interest exist. (*Holloway v. Arkansas* (1978) 435 U.S. 475, 482; *People v. Doolin* (2009) 45 Cal.4th 390, 459.) "'Conflicts of interest may arise in various factual settings. Broadly, they "embrace all situations in which an attorney's loyalty to, or efforts on behalf of, a client are threatened by his responsibilities to another client or a third person or by his own interests."'" (*People v. Doolin, supra*, 45 Cal.4th at p. 459, italics omitted.)

The United States Supreme Court has stated that prejudice is presumed when a criminal defense attorney is burdened by an actual conflict of interest. (*Strickland v. Washington* (1984) 466 U.S. 668, 692 (*Strickland*).) However, prejudice is presumed only if a criminal defendant demonstrates that counsel "'actively represented conflicting interests' and that 'an actual conflict of interest adversely affected his lawyer's performance.' [Citation.]" (*Ibid.*)

In *Aceves*, the opinion which Zerbib cited to the trial court, the appellate court held

18

that, where issues of confidentiality prevent "counsel from further disclosure and the court [accepts] the good faith of counsel's representations, the court should find the conflict sufficiently established and permit withdrawal." (*Aceves, supra,* 51 Cal.App.4th at p. 592, citing *Uhl v. Municipal Court* (1974) 37 Cal.App.3d 526, 527–528 and *Leversen v. Superior Court* (1983) 34 Cal.3d 530, 539.) In *Aceves,* a deputy public defender discovered on the eve of trial that he had a conflict with his client and moved to be relieved. Counsel stated that he could not, without compromising his client's confidences and breaching his ethical duty, reveal the precise nature of the conflict. The office of the public defender, however, was willing to reveal sufficient information couched in general terms. It gave the court insight into the nature of the conflict: The public defender "described the conflict as one that (1) was confined to [the defendant] and the office of the public defender, (2) did not involve threats to witnesses or third parties, (3) did not relate to other cases and (4) had resulted in a complete breakdown of the attorney-client relationship ...." (*Aceves, supra,* 51 Cal.App.4th at p. 592.) The trial court accepted these representations, finding them honest and sincere. (*Id.* at p. 592, fn. 6.) The Court of Appeal concluded that these limited disclosures were sufficient to support the motion for withdrawal as counsel. (*Id.* at p. 593.)

The *Aceves* court noted that, although defense counsel had not revealed the specific facts underlying the conflict, "he gave the court meaningful information about the general nature of the conflict and made clear he properly evaluated exceptions to the privilege; all parties, including the prosecutor, were satisfied the communication was privileged. Under the circumstances, the disclosure was sufficient to permit withdrawal." (*Aceves, supra,* 51 Cal.App.4th at p. 593, fn. omitted.) The appellate court rejected a contention it was impermissible for the trial court to accept the representation of defense counsel that a conflict had existed. As an officer of the court, the defense attorney was in the best position to identify a conflict and advise the court about the problem. (*Id.* at pp. 593–594.) Finally, *Aceves* noted that this conflict had impacted the entire public defender's office, which did "not declare conflicts lightly." (*Id.* at p. 594.)

In the present matter, *Aceves* does not establish that the trial court abused its discretion in denying the withdrawal. Contrary to what occurred in *Aceves*, the trial court did not accept Zerbib's vague grounds as establishing a conflict of interest. Appellant did not agree to permit Zerbib to withdraw. These are critical distinctions which make *Aceves* distinguishable. Moreover, the *Aceves* court made it clear that a trial court need not "accept a sweeping claim of conflict and 'rubber stamp' counsel's request to withdraw." (*Aceves, supra,* 51 Cal.App.4th at p. 592.) A trial court has a duty to explore any alleged conflict, and counsel has a corresponding duty to respond, and to describe the general nature, as fully as possible but within the confines of any privilege. (*Id.* at pp. 592–593.)

Here, the trial court repeatedly invited Zerbib to provide details, within the confines of any privilege, to establish that withdrawal on the (then) eve of trial was warranted. Zerbib, however, only provided vague explanations that were often refuted by appellant, such as a failure to communicate. Zerbib did not give the court meaningful information. An actual conflict of interest was not demonstrated and Zerbib did not adequately explain why a withdrawal was mandatory with a complex trial about to start.

Appellant claims that an actual conflict of interest existed. According to appellant, the trial court should have realized that Zerbib could not divulge any more information without jeopardizing his duty of confidentiality. We are not persuaded. The trial court found that it did not have enough information to

discharge Zerbib's representation over appellant's objection, and we see no basis for overturning that finding. We also reject appellant's assertion that the trial court should have inquired more into the issue of Zerbib seeking employment with the prosecutor's office. To the contrary, the court fully explored this issue with both Zerbib and appellant. Zerbib made it clear that he had fully apprised appellant of the situation. As the court noted, however, appellant still wanted Zerbib to represent him.

Finally, appellant's cited opinion, *Jackson, supra*, 167 Cal.App.3d 829, does not assist him. In *Jackson*, the criminal defense attorney was dating the prosecutor in his client's case, and that fact was not disclosed to the client prior to the conclusion of his criminal trial. (*Id.* at p. 831.) The appellate court concluded that, at a minimum, a potential conflict of interest had existed, which had required full disclosure to the client and an opportunity to obtain new counsel unencumbered by potential divided loyalties. (*Id.* at p. 833.) The *Jackson* court determined that a showing of actual prejudice was not required. (*Ibid.*) The defendant's judgment was reversed. (*Id.* at p. 834.)

Appellant argues that Zerbib was similar to the defense attorney in *Jackson*. According to appellant, Zerbib had hoped to be hired by the opposing district attorney's office, and Zerbib would have not wanted to vigorously pursue his cause. Appellant contends that, in claims later discussed in this appeal, Zerbib was "unprepared" and did little to advance "appellant's claim of innocence." We reject these arguments.

Unlike the situation that occurred in *Jackson*, Zerbib did disclose his potential conflict of interest to appellant regarding his attempts to find employment with the district attorney's office. Zerbib did not hide any information. Moreover, the trial court specifically stated that nothing indicated that Zerbib was not doing "a good and adequate job" in his representation. *Jackson* is distinguishable and it does not establish that reversal is warranted here.

Based on this record, we will not disturb the trial court's ruling denying Zerbib's request to withdraw. The court conducted lengthy hearings and an actual conflict of interest was not established. Appellant was adamant that he wanted Zerbib to continue the representation. The court did not exercise its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice. As such, an abuse of discretion is not present, and this claim fails. [Fn.9]

> [Fn.9] Because the trial court did not abuse its discretion, we do not reach appellant's arguments regarding prejudice.

Garza, 2023 WL 415659, at *8-14.

a.   Legal Standard and Analysis

Under the Sixth Amendment, "[w]here a constitutional right to counsel exists, ... there is a correlative right to representation that is free from conflicts of interest." Wood v. Georgia, 450 U.S. 261, 271 (1981). To establish a Sixth Amendment violation based on a conflict of interest, "a defendant who raised no objection at trial must demonstrate that an actual conflict of interest

20

1    adversely affected his lawyer's performance." <u>Cuyler v. Sullivan</u>, 446 U.S. 335, 348 (1980). An

2    "actual conflict" means "a conflict of interest that adversely affects counsel's performance," rather

3    than "a mere theoretical division of loyalties." <u>Mickens v. Taylor</u>, 535 U.S. 162, 171, 172 n.5

4    (2002). When this standard is met, prejudice is presumed because the "assistance of counsel has

5    been denied entirely or during a critical stage of the proceeding." <u>Id</u>. at 166. However, in

6    <u>Mickens</u>, the Supreme Court explicitly limited this presumption of prejudice for an actual conflict

7    of interest (also known as the "<u>Sullivan</u> exception") to cases involving "concurrent

8    representation." <u>Id</u>. at 175.  The <u>Mickens</u> court "explicitly concluded that . . . any extension of

9    <u>Sullivan</u> outside of the joint representation at trial context remained, 'as far as the jurisprudence

10    of[the Supreme Court was] concerned, an open question.'" <u>Earp v. Ornoski</u>, 431 F.3d 1158, 1184

11    (9th Cir.2005) (quoting <u>Mickens</u>, 535 U.S. at 176).

12         Following <u>Mickens</u>, the Ninth Circuit held that a state court's rejection of a conflict claim

13    not stemming from concurrent representation is neither contrary to, nor an unreasonable

14    application of, established federal law as determined by the United States Supreme Court.  <u>See</u>,

15    <u>e.g.</u>, <u>Earp</u>, 431 F.3d at 1184 (holding that the state court did not unreasonably reject a conflict

16    claim arising from the petitioner's counsel developing a romantic relationship with the petitioner

17    culminating in their marriage because "[t]he Supreme Court has never held that the <u>Sullivan</u>

18    exception applies to conflicts stemming from intimate relations with clients"). In <u>Foote v. Del</u>

19    <u>Papa</u>, 492 F.3d 1026 (9th Cir. 2007), the Ninth Circuit acknowledged that although it had

20    previously recognized that an "irreconcilable conflict" between a criminal defendant and his trial

21    counsel may entitle a defendant to new counsel, no Supreme Court case has held that an

22    "irreconcilable conflict" between the defendant and his appointed counsel violates the Sixth

23    Amendment.  <u>Id</u>. at 1029 (citing <u>United States v. Moore</u>, 159 F.3d 1154, 1158 (9th Cir.1998)).

24         In this case, counsel requested to withdraw due to a conflict of interest, but counsel did

25    not identify a conflict other than a breakdown in communication.  The trial court repeatedly

26    inquired into counsel's alleged communication breakdown, but counsel would not offer specifics.

27    In his objections, Petitioner points to the fact that counsel was planning to join the District

28    Attorney's Office in the future and did in fact become so employed one year later. (Doc. 54 at

13.) However, there was no actual or apparent conflict during trial, as counsel was not employed by the District Attorney's Office at the relevant time. Petitioner speculates that "providing a poor outcome in this case might be tied to an employment opportunity as a prosecutor." (Doc. 54 at 13.) This argument is completely unfounded and poor performance in a trial can hardly be considered a desirable trait for a future applicant.

The Court further notes that, significantly, when questioned at trial, Petitioner himself denied the existence of any actual conflict. The only apparent conflict identified stemmed from counsel's dissatisfaction with Petitioner's grievances to the State Bar.  Since the Supreme Court has never held that an irreconcilable conflict may entitle Petitioner to new counsel, much less a conflict disavowed and/or waived by Petitioner, "it cannot be said that the state court 'unreasonabl[y] appli[ed] clearly established Federal law.'" Musladin, 549 U.S. at 77 (quoting 28 U.S.C. § 2254(d)(1)).  The claim should be denied.

### 2.  Claim Two

Petitioner next alleges defense counsel rendered ineffective assistance by failing to present expert testimony regarding the relevance and importance of a sexual assault forensic examination in this case.  This claim was also raised on appeal.  In the last reasoned decision, the Fifth DCA rejected the claim as follows:

> Appellant argues that Zerbib rendered ineffective assistance by failing to call an expert witness at trial to discuss a "SART" examination. [Fn.11] He seeks reversal of his judgment.
>
> > [Fn.11] The jury learned that a SART examination involves a specially trained nurse who examines a sexual assault victim and takes swabs.
>
> ***A. Background.***
>
> During trial, Detective Fausnett explained on cross-examination that he did not have Doe undergo a SART exam. Fausnett believed such an exam would have had no value because appellant's last alleged sexual contact with Doe had occurred about two years prior to Fausnett's involvement. Fausnett explained to the jury that he had discussed this issue with other officials, including his supervisors and the MDIC team, and they had decided that a SART exam "had no value to it." Later in his testimony, Fausnett clarified that a SART exam is "very invasive." According to Fausnett, a specially trained nurse takes swabs and examines a sexual assault victim's vagina, anus and breasts.
>
> During cross-examination at trial, Zerbib asked Fausnett a series of questions in an attempt to establish that scarring on a victim's genitalia could show past trauma or

sexual activity. The court sustained an objection based on a lack of foundation. Zerbib asked Fausnett if there were "any other additional purposes for a SART exam" other than to collect evidence. Following an objection, the court informed Zerbib that the defense was going into areas that required a specialized forensic medical practitioner to answer, and Fausnett had already indicated that he did not have the special training needed to answer these questions.

During appellant's case-in-chief, the defense did not call an expert witness to testify. During the prosecution's rebuttal, Urquiza testified about CSAAS. After Urquiza testified, Zerbib informed the court that he wanted to preserve the right to recall Urquiza to describe a SART examination, and its relevance in this case. Zerbib argued that such evidence went "to the overall issue" whether or not any sexual abuse had occurred. The court denied that request, noting that Urquiza was not a medical doctor. A short time later, Zerbib then informed the court that he had spoken with Urquiza on a break, and he would not be calling him as a witness after asking Urquiza if he had any expertise or knowledge that could assist the jury.

## B. Standard of review.

Under the federal and state constitutions, a criminal defendant is entitled to the effective assistance of counsel. (U.S. Const., 6th Amend.; Cal. Const., art. I, § 15; *People v. Ledesma* (1987) 43 Cal.3d 171, 215.) To prevail on a claim of ineffective assistance of counsel, a defendant must establish two criteria: (1) that counsel's performance fell below an objective standard of reasonable competence and (2) that he was thereby prejudiced. (*Strickland, supra*, 466 U.S. at pp. 687–688.) The defendant has the burden of showing both deficient performance and resulting prejudice. (*People v. Lucas* (1995) 12 Cal.4th 415, 436.)

## C. Analysis.

Appellant asserts that his trial was rendered fundamentally unfair because Doe was not forensically examined, and this case was a credibility contest between himself and her. He contends that an expert witness could have explained how a SART exam can show the presence or absence of scar tissue on a molestation victim. According to appellant, Detective Fausnett provided a "false claim" to the jurors that a SART exam had no evidentiary value in this case. Appellant argues that Zerbib rendered ineffective assistance because he failed to refute Fausnett's testimony, and the defense failed to call an expert witness who could have explained the value of a SART exam. Appellant maintains that Zerbib failed to explain to the jury that the government's medical theory "was false."

Appellant's arguments are unpersuasive and he does not demonstrate ineffective assistance of counsel. He neither establishes that Zerbib's performance fell below an objective standard of reasonable competence, nor does he show that he was thereby prejudiced.

### 1. Appellant fails to demonstrate incompetency.

A claim of ineffective assistance of counsel is normally raised in a writ of habeas corpus. (*People v. Snow* (2003) 30 Cal.4th 43, 111.) In such a writ, relevant facts and circumstances can be explored which are not reflected in the record on appeal, such as why counsel did not pursue a particular trial strategy. (*Ibid*.) To promote judicial economy in direct appeals, a verified petition for a writ of habeas corpus should be joined if the appellate record does not provide an explanation why defense counsel acted in the challenged manner. (*People v. Mendoza Tello* (1997)

23

15 Cal.4th 264, 267.) Our Supreme Court has repeatedly stated that if the appellate record sheds no light on why defense counsel acted or failed to act in the challenged manner, the claim on direct appeal must be rejected unless counsel was asked for an explanation and failed to provide one, or unless there can be no satisfactory explanation. (*Id*. at p. 266.)

We cannot determine from this limited appellate record why Zerbib did not call an expert witness to testify about a SART exam. We note, however, that—unless it stems from an unreasonable failure to investigate—it is generally a matter of trial tactics regarding which witnesses an attorney will call to testify, and an appellate court will not second-guess such decisions. (*People v. Bolin* (1998) 18 Cal.4th 297, 334; *People v. Mitcham* (1992) 1 Cal.4th 1027, 1059.) It is unknown whether Zerbib consulted with a potential expert witness. If Zerbib did consult with an expert witness, we could only speculate regarding the scope and persuasiveness of any potential expert testimony.

In any event, we cannot state that there can be no satisfactory explanation to justify Zerbib's failure to present expert testimony regarding a SART exam. To the contrary, Zerbib could have determined that the fact Doe was not subjected to a SART exam called into question the veracity of her claims, which were uncorroborated by any forensic evidence. Zerbib could have been concerned that presenting an expert witness for the defense would have triggered rebuttal evidence from the People, which could have strengthened the case against appellant. Zerbib could have believed that the jury appeared unsophisticated so that scientific testimony would have been more confusing than helpful. Zerbib could have believed that the testimony was sufficient from the nurse practitioner who had examined Doe in 2014 and found nothing that warranted reporting any abuse.

Zerbib was not asked for an explanation regarding his failure to call an expert witness regarding SART exams. This record does not affirmatively disclose that no rational tactical basis supported Zerbib's failure in this regard. Thus, appellant's claim on direct appeal must fail. (See *People v. Mitcham, supra*, 1 Cal.4th at p. 1059 [rejecting ineffective assistance claim because record did not reveal why defense counsel failed to present a defense].)

Finally, we reject appellant's assertion that Zerbib was ineffective in eliciting testimony from Detective Fausnett on cross-examination that led to Fausnett stating that no reason had existed to conduct a SART exam on Doe. Cross-examination is always risky, and even experienced defense attorneys might inadvertently elicit disclosures which are damaging to the defense. (*People v. Ervin* (2000) 22 Cal.4th 48, 94.) An appellate court will generally not second-guess an attorney's cross-examination tactics. (*Ibid*.) Instead, cross-examination comes within the wide range of tactical decisions that competent counsel must make. (*People v. Cleveland* (2004) 32 Cal.4th 704, 746.)

Based on this record, appellant has failed to establish that Zerbib's performance fell below an objective standard of reasonable competency. Accordingly, appellant did not meet his burden of proof in establishing the first prong of ineffective assistance of counsel. Therefore, this claim must fail. In any event, we also determine that appellant fails to establish prejudice.

### *2. Appellant fails to establish prejudice.*

Without citing to any evidence in this record, appellant contends that scarring

would be "expected" on Doe's genitalia if he had sexually penetrated her while she was 10 or 11 years old. He argues that photographs taken during a SART exam could have preserved possible exculpatory evidence. He clarifies that his argument does not hinge on assuming that there would be evidence of scarring. Instead, he states that no effort was made to obtain possible exculpatory evidence or to look for confirmation of Doe's claims of frequent penetration. He insists that this was a "close case" because his guilt rested exclusively on Doe's testimony, and he asserts that this case has elements that show he was falsely accused. He maintains that Zerbib presented no real affirmative defense to the jury, and he argues that it is reasonably probable the outcome of his trial would have been more favorable to him if the jury had been advised of the likelihood that a SART exam could have disclosed whether Doe's claims of sexual penetration were true.

We reject appellant's arguments, and he does not establish prejudice. It is not enough for appellant to show that the alleged errors may have had some conceivable effect on the trial's outcome. Instead, he must show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Strickland, supra*, 466 U.S. at p. 694.)

As an initial matter, we note that neither party discussed or even mentioned during closing arguments the lack of a SART exam in this case. Neither attorney mentioned Fausnett's belief that a SART exam was not needed. Because neither party raised this issue with the jury, it appears highly unlikely that the jurors would have given any weight or consideration to Fausnett's testimony in this regard.

Although Zerbib did not call an expert witness regarding a SART exam, Zerbib did remind the jurors during closing argument that they had heard testimony from the nurse practitioner whom the defense had called to testify. That witness had examined Doe in April 2014. Zerbib asserted that this examination occurred when the sexual abuse was allegedly occurring on a near daily basis. Zerbib reminded the jurors that, despite Doe's claims that the abuse was often happening around this time period, the nurse practitioner had found no signs of abuse, and Doe had appeared to her as "a normal child." Zerbib argued that the prosecution had failed to meet its burden of proving the allegations beyond a reasonable doubt, and the jury should find appellant not guilty.

Doe provided testimony in this matter that was overwhelming regarding appellant's criminal behavior with her. No reasonable explanation was given to the jury regarding why she might have a motive to lie. Her trial testimony was consistent in material aspects with her pretrial statements regarding the abuse.

During closing argument, the prosecutor reminded the jurors that they had seen Doe "get up here and cry, and struggle through her testimony." The prosecutor asked the jurors to consider Doe's demeanor on the witness stand. The prosecutor submitted that Doe's demeanor was not from someone who had been manipulated to lie in court. Instead, it was the demeanor of a child who had been forcibly raped by her father. The prosecutor asked the jurors to find appellant guilty of all charges.

The jury found appellant guilty of all charges, and it found true all special allegations. Although no forensic evidence was introduced against him, we reject appellant's assertion that this was a close case. To the contrary, the prosecution conclusively established appellant's guilt through Doe's extremely persuasive

25

1    testimony and her apparent credible demeanor on the witness stand.

2    It is not reasonably probable the outcome of this matter would have been different
     had the defense called an expert witness to discuss the possible value of
3    conducting a SART exam. Doe established appellant's repeated criminal behavior,
     and confidence in the outcome of this matter is not sufficiently undermined based
4    on Zerbib's alleged errors. Thus, appellant does not establish that any presumed
     error actually prejudiced him. As such, he has failed to establish both prongs of his
5    claim of ineffective assistance of counsel.

6    *Garza*, 2023 WL 415659, at *16-19.

7                        a.  Legal Standard

8           Effective assistance of counsel is guaranteed by the Due Process Clause of the Fourteenth

9    Amendment.  Evitts v. Lucey, 469 U.S. 387, 391-405 (1985).  Claims of ineffective assistance of

10   counsel are reviewed according to Strickland's two-pronged test.  Strickland v. Washington, 466

11   U.S. 668, 687-88 (1984); Miller v. Keeney, 882 F.2d 1428, 1433 (9th Cir. 1989); United States v.

12   Birtle, 792 F.2d 846, 847 (9th Cir.1986); see also Penson v. Ohio, 488 U.S. 75 (1988) (holding

13   that where a defendant has been actually or constructively denied the assistance of counsel

14   altogether, the Strickland standard does not apply and prejudice is presumed; the implication is

15   that Strickland does apply where counsel is present but ineffective).

16          To prevail, Petitioner must show two things.  First, he must establish that counsel's

17   deficient performance fell below an objective standard of reasonableness under prevailing

18   professional norms.  Strickland, 466 U.S. at 687-88.  Second, Petitioner must establish that he

19   suffered prejudice in that there was a reasonable probability that, but for counsel's unprofessional

20   errors, he would have prevailed at trial. Id. at 694. A "reasonable probability" is a probability

21   sufficient to undermine confidence in the outcome of the trial. Id. The relevant inquiry is not what

22   counsel could have done; rather, it is whether the choices made by counsel were reasonable.

23   Babbitt v. Calderon, 151 F.3d 1170, 1173 (9th Cir. 1998).

24          With the passage of the AEDPA, habeas relief may only be granted if the state-court

25   decision unreasonably applied this general Strickland standard for ineffective assistance.

26   Knowles v. Mirzayance, 556 U.S. 111, 122 (2009).  Accordingly, the question "is not whether a

27   federal court believes the state court's determination under the Strickland standard "was incorrect

28   but whether that determination was unreasonable–a substantially higher threshold."  Schriro v.

                                        26

1   Landrigan, 550 U.S. 465, 473 (2007); Knowles, 556 U.S. at 123.  In effect, the AEDPA standard

2   is "doubly deferential" because it requires that it be shown not only that the state court

3   determination was erroneous, but also that it was objectively unreasonable.  Yarborough v.

4   Gentry, 540 U.S. 1, 5 (2003).  Moreover, because the Strickland standard is a general standard, a

5   state court has even more latitude to reasonably determine that a defendant has not satisfied that

6   standard.  See Yarborough v. Alvarado, 541 U.S. 652, 664 (2004) ("[E]valuating whether a rule

7   application was unreasonable requires considering the rule's specificity.  The more general the

8   rule, the more leeway courts have in reaching outcomes in case-by-case determinations.")

9                                b.   Analysis

10          The state court reviewed Petitioner's claim under the appropriate Strickland standard and

11   determined that Petitioner failed to show counsel erred or that Petitioner suffered any prejudice as

12   a result. Thus, the only question before this Court is whether those determinations were

13   objectively unreasonable.  The Court finds that they were not.

14          First, the appellate court noted that Petitioner had raised the claim on direct review rather

15   than in a habeas petition. The court stated that ineffective assistance of counsel claims are

16   generally brought in a habeas petition so relevant facts and circumstances can be explored, such

17   as inquiring into why counsel made the decisions he did.  That was not the case here, and the

18   record is bereft of relevant facts necessary to determine whether counsel's actions were

19   unreasonable. It was unknown why defense counsel did not call an expert witness, or whether

20   defense counsel consulted with a potential expert witness.  The appellate court was left to

21   speculate about defense counsel's actions or inactions, and without evidence of an unreasonable

22   failure to investigate, the appellate court would not second guess defense counsel's tactics.  The

23   state court's determination was not unreasonable.  Strickland, 466 U.S. at 689 ("Judicial scrutiny

24   of counsel's performance must be highly deferential").

25          Moreover, the court noted that there were several valid reasons why defense counsel may

26   not have called an expert witness.  First, defense counsel could have determined that the lack of a

27   SART exam demonstrated a lack of any forensic evidence which in turn called the credibility of

28   the victim's testimony into question. Had defense counsel called an expert regarding the value of

27

1  a SART exam, the prosecution might have been compelled to produce rebuttal evidence, which in

2  turn could have strengthened the case for the prosecution. Second, counsel could have been

3  concerned that scientific testimony regarding the value of a SART exam conducted two years

4  after the incident would only have confused the jury.  Third, there was already testimony from a

5  nurse practitioner who examined the victim at the time the abuse was allegedly occurring that

6  nothing was discovered that warranted reporting any abuse.  Counsel could have believed that this

7  testimony alone, conducted during the relevant time, highlighted the lack of forensic evidence

8  supporting the victim's accusations.

9          The state court also determined that Petitioner failed to show prejudice, that is, but for

10  defense counsel's errors, the outcome would have been different. A fairminded jurist could also

11  agree with the state court's determination.  Petitioner only speculates as to what a SART exam

12  might have revealed.  There is no evidence in the record whether scarring would have been

13  expected, and if so, what the significance of scarring or lack of scarring might be.  Further,

14  Petitioner proffers no evidence that an expert would have testified and what that testimony would

15  have been.  This is fatal to Petitioner's claim.  See Hendricks v. Calderon, 70 F.3d 1032, 1042

16  (9th Cir. 1995) (citing James v. Borg, 24 F.3d 20, 26 (9th Cir.1994)) ("Absent an account of what

17  beneficial evidence investigation into any of these issues would have turned up, [the petitioner]

18  cannot meet the prejudice prong of the Strickland test.").

19          In sum, Petitioner fails to overcome Strickland's high standard of demonstrating the state

20  court rejection of his claim to be objectively unreasonable, nor does he show that the state court

21  decision resulted from an unreasonable determination of the facts.  The claim should be denied.

22                      3.  Claim Three

23          Petitioner contends defense counsel was ineffective when counsel failed to object to

24  uncharged bad acts, i.e., the victim's testimony that Petitioner inappropriately touched her over

25  100 times.  Petitioner raised this claim on direct review. The appellate court rejected the claim in

26  the last reasoned state court decision, as follows:

27          Appellant asserts that Zerbib was ineffective because he did not object to, or
          attempt to exclude, Doe's trial testimony wherein she claimed that appellant had
28          inappropriately touched her more than 100 times. Appellant argues that the jury

was improperly permitted to consider these 100 uncharged prior bad acts. He contends that he suffered prejudice, and his convictions must be reversed.

### A. Background.

During trial cross-examination, Zerbib asked Doe if "anything else" had occurred after the living room incident but before the choking incident. Without providing any details, Doe testified that "it happened multiple times" and there were "a lot of times" that other things happened with appellant.

During redirect, the prosecutor asked Doe if there were other incidents of sexual assault that had not yet been discussed. Zerbib objected that this was beyond the scope of redirect examination, which the trial court overruled. Doe stated that the incidents with appellant happened when she was 10 to 13 years old, and it happened almost every day. Doe agreed with the prosecutor that the times that had been discussed in court were the incidents that Doe had remembered the best.

During recross-examination, Doe agreed that she told Fausnett that the incidents with appellant happened more than 50 times, and she also agreed telling Fausnett that it happened more than 100 times. However, she denied recalling that she told Fausnett that this had happened more than 150 times. A short time later, Zerbib asked Doe if it was her testimony that her father had touched her inappropriately almost every day between the time she was 10 years old to 14 years of age. Doe responded, "Not almost every day, it occurred."

### B. Analysis.

Appellant notes that his jury was not instructed on how to consider any prior uncharged crimes. He argues that Doe's generic testimony about these uncharged acts had little probative value but was highly inflammatory. He contends that Zerbib should have sought exclusion of this testimony through various provisions in the Evidence Code. He maintains that Zerbib did very little to present a defense, noting that Zerbib failed to follow through on showing a diagram to Doe that could have established how small their residence was when these incidents occurred, [Fn.12] and the defense never called Doe's mother or brothers to testify. Appellant asserts that such evidence could have demonstrated how improbable it was for appellant to have "undiscovered access" to Doe.

> [Fn.12] During Doe's cross-examination, Zerbib asked her to examine a hand drawn diagram of the residence. Doe stated that the residence "wasn't that big." Doe stated that the drawing was not quite correct because of differences in some furniture from when she had lived there. The prosecutor objected to that diagram being moved into evidence, which the court sustained.

We reject this claim. This limited appellate record sheds no light on why Zerbib failed to raise the objections which appellant now contends establishes incompetency, and appellant did not file a verified writ of habeas corpus concurrent with this appeal. Our Supreme Court holds that a defense attorney may choose not to raise an objection for numerous reasons, and an attorney's failure to object "rarely establishes ineffectiveness of counsel." (*People v. Kelly* (1992) 1 Cal.4th 495, 540.)

We cannot state that there can be no satisfactory explanation to justify Zerbib's failure to object to Doe's disputed testimony. Zerbib could have reasonably

29

determined that it was better not to draw unwarranted attention to Doe's vague and uncorroborated assertions. Zerbib could have reasonably believed that he had impeached Doe's testimony sufficiently with her prior inconsistent statements so that the jury would not find her credible. Zerbib could have reasonably concluded that Doe's assertion appeared unreasonable on its face, and jurors might reject it.

During closing argument, Zerbib questioned the veracity of Doe's claims, noting that the prosecution had not provided any corroboration for them. Zerbib acknowledged that corroboration was not legally needed in a sexual assault case. However, Zerbib noted that neither Doe's mother nor her brothers had been called to testify. Zerbib stated that Doe had claimed that the inappropriate touchings had occurred almost every day for three years. Zerbib argued that, if that were true, appellant was the "luckiest child molester in the world" because he was able to repeat this behavior for so long "with two other kids in the house." Zerbib asserted to the jurors that this scenario did not make sense, and appellant did not molest Doe.

Based on the arguments made to the jury, it appears that Zerbib made a tactical decision regarding how to respond to Doe's disputed testimony. In any event, this record does not affirmatively disclose that no rational tactical basis existed for Zerbib's failure to raise the evidentiary objections which appellant contends were required. Zerbib was not asked for an explanation regarding his failure to object to Doe's disputed testimony. Because this limited record does not reveal why Zerbib acted as he did, appellant's claim fails. [Fn.13] (*See People v. Mendoza Tello, supra*, 15 Cal.4th at p. 266.)

> [Fn.13] The parties disagree whether or not Doe's disputed testimony was admissible under Evidence Code sections 352, 1101, and/or 1108. We need not resolve that conflict regarding the admissibility of Doe's testimony, which is not material to resolving appellant's claim of ineffective assistance of counsel. Instead, this claim fails because this record does not affirmatively disclose that no rational tactical basis existed for counsel's failure to raise the evidentiary objections which appellant now contends were required. As such, we likewise do not reach appellant's arguments regarding alleged prejudice.

Garza, 2023 WL 415659, at *19-20.

              a.   Analysis

       The standard for reviewing ineffective assistance of counsel claims pursuant to Strickland is previously set forth, *supra*. The state court correctly applied the Strickland standard, and therefore the question before this Court is whether that application was objectively unreasonable. Again, the Court finds it was not.

       Like the previous claim, the record was not developed in the state courts as to this claim. Therefore, it is unknown why defense counsel did not raise the objections Petitioner claims he should have made. The appellate court noted that an attorney's failure to object rarely establishes ineffectiveness, and with only speculation as to counsel's decisions, Petitioner failed to overcome

1    the presumption that counsel acted reasonably. A fairminded jurist could agree with this

2    determination.

3          Moreover, the court noted several reasons why defense counsel might have decided not to

4    object to the victim's testimony. Counsel could have determined that objecting would have called

5    unnecessary attention to the victim's vague and uncorroborated testimony.  He could have

6    determined that he had already sufficiently impeached the victim with her prior inconsistent

7    statements.  Finally, defense counsel could have decided that the jury would have determined that

8    the victim's statements were unreasonable on their face, and thus rejected them.  In closing

9    remarks, defense counsel pointed out the implausibility of her claims and that they lacked any

10   corroboration.  The state court's determination that defense counsel made a tactical decision not

11   to object but rather attack the testimony during closing remarks was not unreasonable.

12         Petitioner also fails to demonstrate that counsel's failure to object had a "substantial and

13   injurious effect" on the verdict.  The victim recalled the five charged instances of abuse in detail.

14   As noted by the appellate court, the evidence was overwhelming and compelling. There is no

15   likelihood that the jury's verdict was substantially affected by the victim's vague testimony of

16   uncharged instances.  The claim should be denied.

17              4.  Claim Four

18         At trial, it was discovered that jurors had discussed Petitioner's decision not to testify

19   during its deliberations.  The appellate court determined that this constituted juror misconduct but

20   found the presumption of prejudice rebutted.  Petitioner alleges the state court determination was

21   unreasonable.  The appellate court's decision rejecting the claim is as follows:

22         After appellant was convicted, he filed a motion for a new trial based on alleged
           jury misconduct. [Fn.15] It came to light that, during deliberations, jurors had
23         discussed the fact that appellant did not testify. An investigator from the district
           attorney's office interviewed a juror, juror No. 10 (hereinafter "Juror No. 10"), and
24         those recorded statements were the basis of appellant's motion for a new trial. The
           trial court denied the motion, finding that the jurors' discussion was not prejudicial.
25         Appellant contends that the court's ruling was in error. He seeks reversal of all of
           his convictions.
26
              [Fn.15] It was not Zerbib who filed the motion for a new trial. Instead,
27            following the postconviction *Marsden* hearing in September 2018, it was
              the newly appointed counsel who filed the motion for a new trial in
28            December 2018.

                                              31

*A. Background.*

We summarize the relevant facts that support appellant's argument that the trial court erred in not granting a new trial based on jury misconduct.

*1. The relevant jury instruction.*

The trial court instructed the jury that appellant had an absolute constitutional right not to testify. [Fn.16] The jurors were told that appellant could rely on the state of the evidence and argue that the prosecution had failed to prove the charges beyond a reasonable doubt. The jurors were cautioned that they could not consider for any reason at all the fact that appellant did not testify. They could not discuss this fact during the deliberations, and this could not influence their decision in any way.

> [Fn.16] When giving this instruction, the trial court misspoke and said that appellant had "an absolute constitutional right not to testimony."

*2. The motion for a new trial.*

Appellant's motion for a new trial was based on a recorded interview with Juror No. 10, which was conducted by an investigator for the district attorney's office. The parties stipulated that a transcript of this recording would be admissible in the same manner as a sworn affidavit.

According to Juror No. 10, the jurors had discussed appellant's failure to testify while they were deliberating this case. The jurors thought appellant was going to testify "but he didn't, so we all kind of like, uh, why didn't he go?" Another juror had asked, "Why didn't he go up there? Why didn't he, you know have something to say about his case?" Juror No. 10 stated that "everyone" talked about this, and jurors commented that it was "strange." Juror No. 10 herself thought it was "weird" that appellant did not testify and try to defend himself.

Juror No. 10 further explained that she watched a lot of television so, when she heard how long the trial was estimated to last, she "just assumed" appellant would testify. She stated that she did not know "if it was maybe me just thinking like, oh, automatic guilt then since he didn't go up there." When asked whether appellant's failure to testify factored into her verdicts, Juror No. 10 answered, "Not really. I guess I don't know. I was kinda [sic] hoping he would get up there to say something. I don't know if—'cause I mean obviously he was fighting that it never happened, so I mean just to clear his name maybe to go up there and say like if he did do it he's remorseful, or if he wasn't, or if he didn't do it, it was like, you know, this is absurd." Juror No. 10 then indicated that appellant's failure to testify did not "really" factor into her decision. Instead, she just "processed" what the parties had argued.

According to Juror No. 10, all of the jurors had also wondered whether appellant's family was present in the court during trial. The jurors wanted to know who was in the audience and whether appellant's family was supporting him. Juror No. 10, however, denied taking those thoughts into consideration when deciding appellant's guilt. The investigator concluded the interview stating that, if she had understood Juror No. 10 correctly, Juror No. 10 had wondered why appellant not testify, but she did not use that information in forming her decisions. Juror No. 10 agreed with that assessment.

32

1

2

### *3. The trial court's ruling denying the motion.*

3
4
5

In January 2019, the trial court heard appellant's motion for a new trial. The court believed nothing showed that the jury had decided appellant's guilt based on appellant's failure to testify. The court concluded that actual prejudice was not shown, and it denied the motion.

6
7
8
9
10

In denying the motion for a new trial, the trial court stated it had reviewed statements from two jurors. As appellant notes in his reply brief, it appears the court was referring to both the recorded transcript from Juror No. 10 and to statements appearing in a declaration filed by Zerbib as part of an earlier motion to obtain jury identifying information. According to Zerbib's prior declaration, the jury foreperson had stated that the jury had considered why they did not hear directly from appellant regarding the allegations against him. According to Zerbib's declaration, the foreperson had been aware of the court's admonishment that appellant had a constitutional right to remain silent, but the jurors had wanted to hear directly from appellant.

11

### *B. Analysis.*

12
13
14
15
16

Appellant contends that jury misconduct occurred when all of the jurors discussed his failure to testify, which triggered an automatic presumption of prejudice. Appellant argues that the prosecution failed to rebut this presumption because Juror No. 10 was ambivalent about whether or not appellant's failure to testify had impacted her verdicts. Appellant further notes that the jury foreperson never admonished the jurors to not consider his failure to testify, and the government did not submit any other juror affidavits to contradict Juror No. 10's statements. According to appellant, the court should have granted the motion for a new trial.

17
18
19
20

Appellant also contends that this situation was "exacerbated" because the jury discussed whether or not appellant's family was present in the courtroom. According to appellant, this indicates that the jurors were looking for information from either appellant or his family that appellant was in fact not guilty of the charges. Appellant asserts that his convictions must be reversed. We disagree. Although a presumption of prejudice was triggered by the jurors' misconduct, that presumption was rebutted. The trial court did not abuse its discretion in denying the motion for a new trial.

21

### *1. This record does not demonstrate a substantial likelihood of prejudice.*

22
23
24
25
26

Misconduct occurs when jurors discuss a defendant's failure to testify in contravention of a direct court order. (*People v. Lavender* (2014) 60 Cal.4th 679, 687; *People v. Leonard* (2007) 40 Cal.4th 1370, 1425 (*Leonard*).) Juror misconduct of this sort gives rise to a presumption of prejudice that may be rebutted if the entire record discloses that there is no "substantial likelihood that the complaining party suffered actual harm." (*People v. Hardy* (1992) 2 Cal.4th 86, 174; *Leonard, supra,* 40 Cal.4th at p. 1425.) On appeal, this court independently reviews the record to determine whether there was a substantial likelihood of prejudice. (*Leonard, supra*, 40 Cal.4th at p. 1425.)

27
28

In *Leonard*, several jurors, including the foreperson, discussed the defendant's failure to testify during the penalty phase of a death penalty case. The jurors said they would have liked to have heard from the defendant because it would have

33

helped them understand why he killed six people, and whether he was truly
remorseful. (*Leonard, supra*, 40 Cal.4th at p. 1424.) At the hearing for a motion
for a new trial, the trial court held that a substantial likelihood that existed the
defendant was prejudiced by the misconduct. (*Id*. at p. 1425.) The court observed
that "wanting to hear defendants testify is natural." (*Ibid.*) The trial court also said
that "merely referencing that they wish [the defendant] would have testified is not
the same as ... drawing negative inferences from the absence of testimony." (*Ibid*.)
The California Supreme Court agreed with the trial court's analysis and found that
the misconduct was not prejudicial. (*Ibid.*)

We agree with respondent that *Leonard* controls in this situation and it establishes
that reversal is inappropriate. We reject appellant's argument that, because the
entire jury discussed appellant's failure to testify, their collective comments cannot
be considered "mere curiosity." Although the jurors in appellant's case should not
have discussed this issue, their discussion was brief and it expressed a collective
natural curiosity. Expressing wonderment about why appellant did not testify is
not the same as drawing negative inferences from the absence of his testimony.
"Transitory comments of wonderment and curiosity, although misconduct, are
normally innocuous, particularly when a comment stands alone without any further
discussion." (*People v. Hord* (1993) 15 Cal.App.4th 711, 727–728.)

There is no evidence that any juror said appellant's failure to testify should be used
in reaching the verdicts. Juror No. 10 specifically agreed with the investigator that
she did not use appellant's failure to testify against him. In an earlier motion,
Zerbib's own declaration strongly indicated that the foreperson had been aware of
the court's admonition that appellant had a constitutional right to remain silent.
Zerbib's declaration did not suggest that any juror actually used appellant's failure
to testify against him.

We agree with respondent that the jurors' improper comments should be viewed as
transitory and fleeting. Further, the jurors' statements about appellant's failure to
testify appear innocuous. The record does not show or even reasonably suggest
that they were repeated or pervasive, and this record does not demonstrate a
substantial likelihood of prejudice. Based on *Leonard*, the trial court did not err in
denying appellant's motion for a new trial.

Appellant cites *People v. Cissna* (2010) 182 Cal.App.4th 1105 (*Cissna*) in an
effort to demonstrate that respondent's reliance on *Leonard* is unavailing. *Cissna*
does not assist appellant.

In *Cissna*, the defendant was convicted of a sex offense involving a minor under
the age of 14. (*Cissna, supra*, 182 Cal.App.4th at pp. 1113–1114.) Beginning on
the first day of testimony, the juror in question met with a friend and discussed the
case on a twice-daily basis. (*Id*. at p. 1114.) The appellate court concluded that
these daily discussions, which were similar to deliberations, had improperly
interjected the views of a nonjuror who had not been vetted through voir dire, had
not been sworn to follow the law, and had not heard all the evidence. (*Id*. at p.
1120.) These improper discussions had included the nonjuror's observation that
"'guilty people do not testify, and if the defendant was not guilty he would
testify.'" (*Id*. at pp. 1114–1115.) *Cissna* held that in "the circumstances of this
case," where the issue of the victim's credibility was of critical importance, "the
discussion of defendant's decision not to testify carried a high potential of
prejudice to the defense." (*Id*. at p. 1121.) The *Cissna* court determined that its
facts were distinguishable from other opinions, including *Leonard*. (*Cissna, supra*,
at p. 1121.) The nonjuror had encouraged the juror to consider issues that were

improper and detrimental to the defense, and a new trial was warranted despite the trial court's general instructions to the jury not to discuss the case with other people and not to consider the improper matters. (*Id*. at p. 1122.)

Appellant contends that, as in *Cissna*, no physical evidence supported Doe's claims against him, and his guilt rested entirely on her credibility and his failure to testify. Appellant also asserts that his credibility had been weakened by Zerbib's alleged ineffective representation throughout the entire proceedings.

We disagree that *Cissna* is applicable here or that it compels us to disregard *Leonard*. Unlike in *Cissna*, no member of appellant's jury conducted secret discussions with a nonjuror regarding the evidence. Although appellant's jury improperly discussed his failure to testify, their conversation appears extremely limited in scope and duration. Evidence exists in this record that Juror No. 10 did not use appellant's failure to testify in reaching her verdicts. A declaration from Zerbib in an earlier motion also strongly suggests that the jury foreperson was aware of the trial court's admonition that appellant had a constitutional right to remain silent, but the jurors were curious why appellant did not testify. *Cissna* is factually distinguishable and it does not establish that reversal is required.

Finally, appellant argues that Juror No. 10's statement lacked credibility when she denied using appellant's failure to testify against him. According to appellant, Juror No. 10 was simply agreeing with the investigator's leading questions. Appellant notes that, earlier in her recorded interview, Juror No. 10 had said she was thinking that appellant's failure to testify might mean "automatic guilt."

We disagree that Juror No. 10's statements failed to rebut the presumption of prejudice. The parties stipulated that the trial court should treat her recorded interview as a sworn affidavit. Juror No. 10 agreed that, although she had wondered why appellant did not testify, she did not use that information in forming her decisions. Although Juror No. 10 admitted that she wondered if his failure to testify might mean automatic guilt, she never stated or suggested that appellant's failure to testify actually factored into her decisionmaking process. Appellant can point to credibility concerns surrounding Juror No. 10's statements. However, it is apparent that the trial court resolved that credibility issue against appellant, and we will not disturb the court's credibility determination because it is supported by substantial evidence. (*People v. Nesler* (1997) 16 Cal.4th 561, 582.)

### *2. Appellant's remaining arguments are unpersuasive.*

Appellant argues that the trial court used the wrong legal standard when denying the motion for a new trial, and it erroneously relied on improper facts. Appellant raises three points to establish that the court erred.

First, the trial court never expressly acknowledged that the jury had considered the fact that appellant had not testified.

Second, appellant contends that the court improperly credited statements attributable to the jury foreperson, which were not in evidence as part of this motion, and which were based on double hearsay through the declaration of Zerbib. Appellant asserts that, because the motion for a new trial was based only on the transcript of Juror No. 10's interview, the court erred in relying on facts that were not before it.

Third, appellant maintains that the court's ruling demonstrates that it permitted

35

1    Juror No. 10 to establish the subjective thought processes of the other jurors. This
     would violate Evidence Code section 1150, which prohibits evidence to show the
2    effect of any event upon a juror either in influencing him to assent to or dissent
     from the verdict, or concerning the mental processes by which the verdict was
3    reached.

4    These remaining arguments are unpersuasive. We have already concluded that
     reversal is not required because this record establishes that any presumption of
5    prejudice was rebutted, and the trial court did not abuse its discretion. Thus, we
     need not fully address appellant's additional arguments regarding how the trial
6    court conducted its analysis. We will not disturb the court's ruling, which was
     correct in law, merely because it was given based on allegedly wrong grounds or
7    under an incorrect standard. Instead, because it is legally correct, the ruling must
     be sustained regardless of the considerations which may have moved the trial court
8    to its conclusion. (See *People v. Zapien* (1993) 4 Cal.4th 929, 976.)

9    Based on this record, the presumed prejudice stemming from the jury misconduct
     was rebutted. Juror No. 10 specifically denied using appellant's failure to testify as
10   a factor in reaching her verdicts. Although the jurors should not have discussed
     this issue, their comments expressed a natural curiosity about why appellant did
11   not testify. These comments were fleeting, and nothing demonstrates that the
     jurors may have used appellant's failure to testify as grounds to find him guilty.
12   There is no substantial likelihood that appellant suffered actual harm. Thus, the
     trial court properly denied appellant's motion for a new trial. Consequently,
13   reversal is not required and this claim fails.

14   Garza, 2023 WL 415659, at *24-27.

15                    a.   Legal Standard and Analysis

16        In ruling on Petitioner's claim of juror misconduct, the state court rejected the claim on

17   state law grounds. Whether state law was violated is not reviewable in federal habeas. Lewis v.

18   Jeffers, 497 U.S. 764, 780 (1990) (federal habeas corpus relief "does not lie for errors of state

19   law"). Petitioner also claimed the alleged juror misconduct violated his Fifth Amendment rights.

20        The state court did not explicitly address Petitioner's claim under the Fifth Amendment.

21   Where the state court "summarily rejects without discussion all the claims raised by a defendant,

22   including a federal claim that the defendant subsequently presses in a federal habeas proceeding,

23   the federal habeas court must presume (subject to rebuttal) that the federal claim was adjudicated

24   on the merits." Johnson v. Williams, 568 U.S. 289, 293 (2013). Petitioner fails to rebut the

25   presumption that the state court implicitly denied his Fifth Amendment claim on the merits.

26   Petitioner argued the state and federal claims interchangeably. Therefore, the state court

27   presumably did so as well.  Accordingly, the Fifth Amendment claim must be analyzed under §

28   2254 standards.

                                          36

1    Defendants have a federal constitutional right to a fair and impartial jury. See Duncan v.

2  Louisiana, 391 U.S. 145, 149 (1968) (Sixth Amendment right to jury trial); Estrada v. Scribner,

3  512 F.3d 1227, 1239 (9th Cir.2008) (Sixth Amendment guarantees criminal defendants verdict by

4  impartial, indifferent jurors) (citation omitted), cert. denied, 128 S.Ct. 2971 (2008). Due process

5  requires that a criminal defendant be tried by "a jury capable and willing to decide the case solely

6  on the evidence before it." Smith v. Phillips, 455 U.S. 209, 217 (1982).

7    The Supreme Court has held that the Fifth Amendment "forbids either comment by the

8  prosecution on the accused's silence or instructions by the court that such silence is evidence of

9  guilt." Griffin v. California, 380 U.S. 609, 615 (1965).  In Portuondo v. Agard, 529 U.S. 61, 67

10  (2000), the Supreme Court held that what was prohibited of the prosecutor was also "something

11  the jury is not permitted to do."  Thus, a jury is not permitted to consider Petitioner's silence as

12  evidence of his guilt.  However, it is clear from Portuondo and Griffin that it is the consideration

13  of Petitioner's guilt that violates the Fifth Amendment, not discussion.  In rejecting Petitioner's

14  claim, the state appellate court determined that jurors committed misconduct by noting the fact

15  Petitioner did not testify; however, the court found no evidence that jurors considered Petitioner's

16  silence in determining his guilt.  After reviewing the record, this Court finds that a fairminded

17  jurist could agree with the state court's determination. The trial court had evidence that the jurors

18  may have discussed Petitioner's silence, but there was no evidence that jurors based their guilty

19  verdict in any way on his silence.

20    Even if the trial court erred in denying Petitioner's motion for new trial, the error was

21  harmless as Federal Rule of Evidence 606(b) does not allow the introduction of evidence that one

22  or more jurors considered petitioner's failure to testify at trial during their deliberations  to

23  impeach Petitioner's verdict in his motion for a new trial.[6] Fed.R.Evid. 606(b); United States v.

24  Rutherford, 371 F.3d 634, 639-40 (9th Cir. 2004). Petitioner's failure to testify in his own defense

25  was not extrinsic evidence, the admission of which would amount a due process violation. See

26

27  [6] The Federal Rules of Evidence apply to habeas corpus proceedings to the extent that the habeas statutes
themselves provide no different rule of evidence. Fed.R.Evid. 1101(e). There is no habeas evidentiary rule
28  on the subject.

37

1   Raley v. Ylst, 470 F.3d 792, 803 (9th Cir.2006) (jury's discussion of "constitutionally forbidden

2   topics," including a defendant's failure to testify, did not amount to a due process violation as it

3   was not extrinsic evidence).  Petitioner also fails to show any prejudice.

4       Where jury misconduct is alleged, "the test is whether or not the misconduct has

5   prejudiced the defendant to the extent that he has not received a fair trial." United States v. Klee,

6   494 F.2d 394, 396 (9th Cir.1974). "To obtain relief, petitioners must now show that the alleged

7   error 'had [a] substantial and injurious effect or influence in determining the jury's verdict.'"

8   Jeffries v. Blodgett, 5 F.3d 1180, 1190 (9th Cir. 1993) (quoting Brecht v. Abrahamson, 507 U.S.

9   619, 637–39 (1993)).  Here, there is evidence that jurors may have discussed Petitioner's decision

10  not to testify, but there is no indication that jurors considered his silence in determining guilt. The

11  evidence of Petitioner's guilt was strong and compelling. The victim recalled the five charged

12  instances of abuse in great detail. Petitioner fails to show any likelihood that the jury's verdict

13  was substantially affected by the jurors' discussion of Petitioner's decision not to testify.  The

14  claim should be denied.

15              5.   Claim Five

16      Petitioner next claims his constitutional rights were violated when the trial court allowed

17  the prosecutor to elicit testimony from a child sex abuse expert regarding case specific facts as

18  well as hypotheticals based on facts tailored to the victim's testimony.  Petitioner raised this claim

19  on direct review. The Fifth DCA issued the last reasoned decision, rejecting the claim on

20  procedural grounds, as follows:

21          Appellant contends that some of his constitutional rights were violated when the
            prosecutor posed certain hypotheticals to Urquiza, the expert regarding CSAAS.
22          Those hypotheticals mirrored certain facts from this case. Appellant seeks reversal
            of his judgment.
23
               ***A. Background***.
24
            We summarize the relevant background facts necessary to understand appellant's
25          claim.

26              ***1. The prosecution's motion in limine regarding CSAAS
                testimony.***
27
            Prior to the presentation of evidence in this matter, the prosecutor filed an in
28          limine motion seeking, in part, permission to present expert testimony regarding

                                      38

CSAAS. At the hearing, the court stated that, in order for this evidence to be admissible, the prosecution had to first identify a "misconception" that this evidence was designed to correct. The prosecutor identified Doe's delay in reporting the abuse. The prosecutor agreed that this proposed expert testimony would be limited to explaining why Doe's behavior was not inconsistent with the alleged abuse.

The trial court reminded both attorneys to be familiar with a then recent opinion from the California Supreme Court, *People v. Sanchez* (2016) 63 Cal.4th 665 (*Sanchez*). The court noted that *Sanchez* prohibits the introduction of expert testimony that relies on case-specific facts. The court, however, commented that the proposed expert testimony in this matter did not seem likely to violate *Sanchez*. After hearing from Zerbib that the defense believed Doe had provided prior inconsistent statements, the court tentatively granted the prosecution's motion to introduce expert testimony regarding CSAAS. The court stated its ruling ultimately depended on the nature of Doe's testimony, but the expert's proposed testimony appeared to be "relevant and necessary, given the limitations" it had indicated. The court, however, did not explain what "limitations" it meant.

### 2. *Urquiza's trial testimony.*

After the defense rested, the prosecution called some rebuttal witnesses, including Urquiza. Urquiza informed the jury about CSAAS, noting it was not a diagnostic tool but intended to educate about how children might respond after being sexually abused. CSAAS identifies trends that research shows how children tend to disclose prior sexual abuse.

Urquiza explained that a child victim often delays reporting sexual abuse. Once disclosure starts, it usually takes time for the full details to emerge. Urquiza testified that many misconceptions exist about sexual abuse. People often assume a sexually abused victim will disclose right away. People incorrectly believe they would be able to recognize a child who has been sexually abused. People wrongly believe that, if a victim retracts the allegation, then it was never true in the first place. Finally, people erroneously think a victim who was sexually abused should be able to describe clearly and easily everything that happened, without any mistakes or errors in the disclosure.

The prosecutor asked Urquiza to imagine a hypothetical child who was forcibly raped by her father between the ages of 10 and 13. This victim was removed from all contact with her father for two years. The victim then became aware that her father might reenter her life. The prosecutor asked if that was something that could trigger the victim to begin a process of disclosing the abuse. Urquiza opined that this situation would cause a lot of anxiety for the victim, and the victim could either disclose the abuse or do something to put themselves in a position where they would not be again sexually abused.

The prosecutor asked another hypothetical in which a child was being abused by her father, but she did not inform her mother. The prosecutor asked why the child may not want to disclose the abuse to her mother. Urquiza responded that researchers were trying to understand that question. The only real consistent finding is that a victim tends to disclose to somebody he or she trusts.

During cross-examination, Urquiza confirmed that he had never evaluated or spoken with any minor involved in this criminal prosecution. He said it was hard to say how any particular child will respond to reporting sexual abuse in a specific

39

1   way. He opined that most children will usually have a significant delay in
    disclosure.

2
    **B. Analysis.**

3
    Appellant asserts that the admission of Urquiza's expert testimony violated the

4   court's in limine order because the prosecutor presented hypotheticals to Urquiza
    that involved "case-specific" facts that assumed Doe had been sexually abused.

5   Appellant maintains that this evidence violated his constitutional rights to a fair
    trial and due process. He argues that, absent this alleged error, it is reasonably

6   probable at least one juror would have held reasonable doubt.

7   We reject appellant's arguments. This claim is forfeited and appellant does not
    establish ineffective assistance of counsel.

8
    **1. This claim is forfeited.**

9
    In part, respondent asks this court to reject this claim based on the forfeiture

10  doctrine. According to respondent, the defense failed to object during Urquiza's
    testimony on the grounds that this evidence allegedly violated the trial court's

11  order or involved case-specific facts. In contrast, appellant contends he has
    preserved this issue for appellate review because he raised some type of an

12  objection during the in limine hearing regarding the admission of any CSAAS
    evidence. However, appellant concedes that the defense's objection during the in

13  limine hearing in this regard was "weak." In the alternative, appellant argues this
    court should reach the merits of this claim based on ineffective assistance of

14  counsel.

15  We agree with respondent that this claim is forfeited. When a trial court makes an
    in limine ruling that certain evidence is admissible, the party seeking exclusion

16  must object during trial when the evidence is actually offered to preserve the issue
    for appeal. (*People v. Letner and Tobin* (2010) 50 Cal.4th 99, 159; *People v.*

17  *Brown* (2003) 31 Cal.4th 518, 547.) A motion in limine to exclude certain
    evidence is sufficient to preserve the issue for appellate review if it satisfies the

18  basic requirement of Evidence Code section 353. [Fn.17] (*People v. Morris* (1991)
    53 Cal.3d 152, 189, disapproved on other grounds in *People v. Stansbury* (1995) 9

19  Cal.4th 824, 830, fn. 1.)

20      [Fn.17] In relevant part, Evidence Code section 353 states that neither a
        verdict shall be set aside nor a judgment reversed from the erroneous

21      admission of evidence unless (1) a timely objection was made that stated a
        clear specific ground and (2) the admitted evidence should have been

22      excluded on the ground stated and the error resulted in a miscarriage of
        justice. (Evid. Code, § 353, subds. (a) & (b).)

23
    To preserve an evidentiary issue for appellate review through a motion in limine,

24  the party seeking exclusion must (1) state a specific legal ground for exclusion that
    is subsequently raised on appeal; (2) direct the motion to a particular, identifiable

25  body of evidence; and (3) make the motion at a time when the trial judge can
    determine the evidentiary question in its appropriate context. (*People v. Morris,*

26  *supra*, 53 Cal.3d at p. 190.) "When such a motion is made and denied, the issue is
    preserved for appeal. On the other hand, if a motion in limine does not satisfy each

27  of these requirements, a proper objection satisfying Evidence Code section 353
    must be made to preserve the evidentiary issue for appeal." (*Ibid.*)

28

                                        40

1
2
3

Here, the trial court only tentatively granted the prosecution's motion in limine to permit rebuttal testimony regarding CSAAS. The court stated its ruling ultimately depended on the nature of Doe's testimony, but the expert's proposed testimony appeared to be "relevant and necessary, given the limitations" it had indicated. The court, however, did not explain what "limitations" it meant.

4
5
6
7

Appellant's objection made during the in limine stage is insufficient to preserve this issue for appellate review. Appellant did not state the legal grounds for objection which he now raises on appeal. In any event, the trial judge was not in a position to determine this evidentiary question before it heard the trial evidence. Moreover, appellant did not raise these evidentiary objections during Urquiza's testimony. Thus, this claim has not been preserved for review, and it is deemed forfeited.

8

Garza, 2023 WL 415659, at *28-32.

9

a.   Procedural Default

10
11

Respondent contends Petitioner is procedurally barred from raising his claim because the state court had determined that he forfeited the claim by failing to object to the evidence at trial.

12
13
14
15
16
17
18
19
20
21
22
23
24

A federal court will not review a claim of federal constitutional error raised by a state habeas petitioner if the state court determination of the same issue "rests on a state law ground that is independent of the federal question and adequate to support the judgment." Coleman v. Thompson, 501 U.S. 722, 729 (1991).  This rule also applies when the state court's determination is based on the petitioner's failure to comply with procedural requirements, so long as the procedural rule is an adequate and independent basis for the denial of relief.  Id. at 730.  For the bar to be "adequate," it must be "clear, consistently applied, and well-established at the time of the [ ] purported default." Fields v. Calderon, 125 F.3d 757, 762 (9th Cir. 1997).  For the bar to be "independent," it must not be "interwoven with the federal law." Michigan v. Long, 463 U.S. 1032, 1040-41 (1983).  If an issue is procedurally defaulted, a federal court may not consider it unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.  Coleman, 501 U.S. at 749-50.

25
26
27
28

The Ninth Circuit has repeatedly held that California's contemporaneous objection doctrine is clear, well-established, has been consistently applied, and is an adequate and independent state procedural rule. Melendez v. Pliler, 288 F.3d 1120, 1125 (9th Cir. 2002); Vansickel v. White, 166 F.3d 953 (9th Cir. 1999).  By failing to object to the introduction of

41

1    Child Sexual Abuse Accommodation Syndrome ("CSAAS") evidence at trial, Petitioner waived

2    his claim in state court and is procedurally barred from raising it here.  In any case, the claim is

3    without merit.

4                        b.      Legal Standard and Analysis

5            Petitioner claims the admission of CSAAS expert testimony violated his due process

6    rights.  He cites to various state court cases on the limitations in the use of such evidence.

7    However, it is well-established that the admission of evidence is governed by state law, and

8    habeas relief does not lie for errors of state law. Estelle v. McGuire, 502 U.S. 62, 67 (1991).

9            With respect to his due process claim, the United States Supreme Court has not held that

10   due process is violated by the admission of expert testimony about CSAAS.  However, the

11   Supreme Court recently clarified that "clearly established law provide[s] that the Due Process

12   Clause forbids the introduction of evidence so unduly prejudicial as to render a criminal trial

13   fundamentally unfair" based on its decision in Payne v. Tennessee, 501 U.S. 808 (1991). Andrew

14   v. White, 604 U.S. ___, ___, 145 S.Ct. 75, 2025 WL 247502, at *5 (2025).  In so concluding, the

15   Supreme Court noted that "[g]eneral legal principles can constitute clearly established law for

16   purposes of AEDPA so long as they are holdings of this Court" and acknowledged that

17   "[a]lthough this Court has not previously relied on Payne to invalidate a conviction for

18   improperly admitted prejudicial evidence . . . 'certain principles are fundamental enough that

19   when new factual permutations arise, the necessity to apply the earlier rule will be beyond

20   doubt.'" Andrew, 2025 WL 247502, at *4 (quoting White v. Woodall, 572 U.S. 415, 427 (2014)).

21   The Ninth Circuit has held that "[o]nly if there are no permissible inferences the jury may draw

22   from the evidence can its admission violate due process. Even then, the evidence must 'be of such

23   quality as necessarily prevents a fair trial.'" Jammal v. Van de Kamp, 926 F.2d 918, 920 (9th Cir.

24   1991) (quoting Kealohapauole v. Shimoda, 800 F.2d 1463, 1465 (9th Cir. 1986)).

25           Here, the trial court tentatively granted the prosecution's motion in limine to permit

26   rebuttal testimony regarding CSAAS, finding "the expert's proposed testimony to be relevant and

27   necessary, given the limitations." Garza, 2023 WL 415659, at *32. Petitioner did not object, and

28   he has not established that the evidence was so unduly prejudicial as to prevent a fair trial.

1    Moreover, in light of the overwhelming evidence of guilt from the victim's testimony, there is no

2    reasonable likelihood that the outcome would have been different absent the testimony regarding

3    CSAAS. The claim should be denied.

4              6.  Claim Six

5         Petitioner next contends the trial court erred when it allowed the prosecutor to present a

6    new theory of liability to meet the requirements for kidnapping for purposes of molestation. The

7    claim was presented on direct review. In the last reasoned decision, the appellate court rejected

8    the claim as follows:

9         In counts 7, 8 and 9, the jury convicted appellant for his conduct during the R & N
          Market incident. These convictions were for (1) kidnapping through a false
10        promise or misrepresentation (§ 207, subd. (b); count 7); (2) attempting to
          dissuade a victim from reporting to a peace officer (§ 136.1, subd. (b)(1); count 8;
11        and (3) committing a lewd and lascivious act upon Doe, who was under the age of
          14 years (§ 288, subd. (b)(1); count 9).
12
          Appellant contends that the trial court erred because it allowed the prosecutor to
13        present a new theory of liability late in the trial proceedings regarding the R & N
          Market incident, i.e., that appellant had committed a lewd act—not by directly
14        touching Doe—but by causing her to remove her own pants. Appellant asserts that
          this error violated his rights to counsel and due process. He seeks reversal of his
15        convictions in counts 7 through 9.

16            A. Background.

17                1. The oral arguments regarding the motion for judgment of
                  acquittal.
18
          At the close of the prosecution's case-in-chief, the defense brought a motion for a
19        judgment of acquittal (§ 1118.1). In relevant part, the defense asserted that,
          pertaining to the R & N Market incident, the evidence did not establish a lewd and
20        lascivious act, a kidnapping for purposes of molestation, or a prevention of Doe in
          reporting a crime.
21
          The prosecutor responded that the evidence showed appellant caused Doe to
22        change positions in the vehicle, and he told her to take off her pants. Doe was
          scared and nervous. The prosecutor noted that CALCRIM No. 1111 provides an
23        alternative theory to a charge under section 288, subdivision (b)(1), that a
          defendant willfully caused a victim to touch his or her body through clothing. It
24        was the People's position that appellant had ordered Doe to remove her pants and
          underwear, which was sufficient.
25
          The court noted it had not heard any evidence that Doe was told to remove her
26        underwear, and the court asked if the evidence showed an actual touching. The
          prosecutor asserted that the evidence was sufficient to find an intent for lewd and
27        lascivious conduct based on appellant's order for Doe to remove her pants, her
          feeling scared and nervous, and a determination that appellant was not looking at a
28        bruise. The prosecutor stated that this situation was similar to stripping. The court

                                          43

confirmed with the prosecutor that the People's theory was that the removal of Doe's pants was not mere preparation for, but was part of, the lewd and lascivious act to arouse appellant's interest. The court then denied the motion for judgment of acquittal in counts 7 through 9.

### 2.    The relevant jury instruction.

In relevant part, the court originally instructed the jury with CALCRIM No. 1111 regarding appellant's alleged lewd and lascivious conduct during the R & N Market incident. The jury was told that, to be guilty, appellant must have touched Doe, either on her bare skin or through the clothing.

After most of the jury instructions had been given, the court excused the jurors for lunch. The court informed the parties that it wanted to revisit the motion for judgment of acquittal regarding count 9. The court noted it had denied that motion because the People had argued it was sufficient if appellant had directed Doe to touch herself. The court stated that the instruction it had provided to the jury had not indicated that appellant could be liable by directing Doe to touch herself, and the court felt that the instruction needed to be modified to reflect the correct law, or the defense motion needed to be granted if the law required appellant to physically touch Doe.

The court asked if CALCRIM No. 1111 needed to be modified, and the prosecutor agreed. Zerbib objected, arguing that the prosecution had had multiple opportunities to review the jury instructions and the theories presented. The court responded that it was required to ensure that the jury was properly instructed. The court also noted that this was not a surprise to the defense because this theory had been argued during the motion for judgment of acquittal.

Following the lunch recess, Zerbib again objected to a modification of CALCRIM No. 1111. According to Zerbib, the parties had reviewed the jury instructions for the last two days, and both parties had agreed with the court that the given instructions reflected the trial testimony. Zerbib asserted that the prosecutor had ample opportunity to request any modifications, but the prosecutor had agreed that morning to the instructions as given.

The court stated it was going to modify CALCRIM No. 1111 because it was a correct statement of the law and it was supported by facts from the trial. The court noted that, especially in light of the arguments presented at the motion for judgment of acquittal, an instructional modification was appropriate.

When the jurors returned to court, they were instructed to put "an X" through their written copies of CALCRIM No. 1111. The bailiff handed them new written instructions, which the court read aloud. In relevant part, the jurors were told that appellant could be guilty in count 9 of committing a lewd and lascivious act under an alternative theory that he willfully caused Doe to touch her own body either on her bare skin or through the clothing.

### B. Analysis.

Appellant contends that his constitutional right to be adequately informed of the accusations against him, as well as his right to due process, were violated when the trial court modified CALCRIM No. 1111. Appellant asserts that this modification was based on a "new theory" raised during the instructional phase of trial. He argues that a violation occurred because the prosecutor had agreed that the original

version of CALCRIM No. 1111 was complete and accurate.

Citing *People v. Quiroz* (2013) 215 Cal.App.4th 65 (*Quiroz*), appellant maintains that the prosecutor misled or ambushed the defense with an alternative theory. He argues that he did not have time to "ramp up his defense" after the prosecutor announced the constructive touching theory at the conclusion of the prosecution's case-in-chief. Appellant notes that he called his defense witnesses immediately afterwards, and all of his witnesses were finished in the same day. He requests that this court strike his convictions in count 7, 8 and 9 due to the lack of notice regarding the "constructive touching" theory upon which the prosecution relied.

Appellant's claim lacks merit. First, the trial court was justified in modifying CALCRIM No. 1111. Second, the prosecution was not obligated to disclose its theory of liability in count 9, but it did provide notice with sufficient time for the defense to respond before closing arguments. Finally, any presumed error is harmless.

### 1.   *The trial court properly modified CALCRIM No. 1111.*

In *People v. Austin* (1980) 111 Cal.App.3d 110 (*Austin*), the defendant ordered a minor girl to pull down her pants while he was holding a knife. He said she could make some money. (*Id.* at p. 112.) The girl pulled down her pants, and the defendant paid her a dollar. (*Ibid.*) The *Austin* court concluded that the defendant "was responsible for the touching and removal of the child's pants as surely as if he had done it himself." (*Id.* at p. 115.)

The doctrine of constructive touching was later applied where a defendant, acting as a photographer, instructed or posed some children in a manner that their hands were caused to be placed upon their own genitalia. (*People v. Meacham* (1984) 152 Cal.App.3d 142, 154 (*Meacham*).) *Meacham* held that "the children's touching of their own genitalia at the instigation of appellant was a 'constructive touching' by appellant himself." (*Id.* at p. 153.)

The California Supreme Court has impliedly endorsed the constructive touching doctrine. (See *People v. Memro* (1995) 11 Cal.4th 786, 872 [the disrobing of the victim while alive, actual or constructive establishes a violation of section 288]; *People v. Mickle* (1991) 54 Cal.3d 140, 176 ["the actual or constructive disrobing of a child" when committed for "a sexually exploitative purpose" is presumptively harmful and prohibited by section 288, subdivision (a)].)

In light of these authorities, we agree with respondent that the trial court was correct to modify CALCRIM No. 1111 and instruct the jury on the constructive touching theory. The court was obligated to instruct on the general principles of law raised by the evidence. (*People v. Diaz* (2015) 60 Cal.4th 1176, 1189.) Doe's testimony established that appellant directed her to remove her pants when they were parked inside the vehicle during the R & N Market incident. Thus, it was a question of fact for the jury to resolve regarding appellant's intent. Accordingly, we reject appellant's argument that the court erred in providing the modified instruction under CALCRIM No. 1111.

### 2. *The prosecution provided sufficient notice of its theory.*

A prosecutor does not generally need to elect a theory of guilt. (See *People v. Garrison* (1989) 47 Cal.3d 746, 776, fn. 12 [holding that the complaint does not need to recite a particular theory of guilt].) However, a prosecutor may not mislead

a defendant regarding the People's theory and ambush the defense late in the proceedings with an alternative theory of guilt. (*Quiroz, supra*, 215 Cal.App.4th at pp. 70–71.)

In *Quiroz*, the defense argued to the jury that the prosecution had shifted its theory of liability from initially claiming the defendant had been the shooter to then claiming the defendant was liable as an aider and abettor. (*Quiroz, supra*, 215 Cal.App.4th at p. 69.) On appeal, the defendant asserted that the People had provided him late notice of the new theory, and that his various constitutional rights had been violated. (*Id*. at p. 70.) The appellate court rejected those assertions, holding that a defendant is placed on notice of a new theory of liability either through the evidence presented at the preliminary hearing, or by the People's express mention of the new theory before or during trial sufficiently in advance of closing argument. (*Id*. at pp. 70–71.) In *Quiroz*, the prosecutor had placed the defense on notice about this theory during voir dire, and then about five days before closing arguments. As such, the appellate court held that the prosecution had not ambushed the defense with their aiding and abetting theory. (*Id*. at p. 71.) Moreover, the *Quiroz* court held that any late notice was harmless. (*Ibid*.) The defendant had "ample time to call witnesses and tailor his closing argument after the People reaffirmed their request for an aiding and abetting instruction." (*Ibid*.) The judgment was affirmed. (*Id*. at p. 81.)

In the present matter, the prosecution disclosed its specific theory of liability in count 9 during the hearing regarding the defendant's motion for judgment of acquittal. That hearing occurred in the morning on January 10, 2018. Closing arguments occurred the following afternoon. If it needed Doe to answer more questions about the R & N Market incident, the defense could have sought leave to have Doe testify further. If it needed additional time, the defense could have also requested a short continuance. However, instead of doing any of these things, the defense proceeded to closing arguments and Zerbib asserted to the jury that nothing had happened during the R & N Market incident. The defense conceded that the circumstances surrounding this incident were unusual, but officials had investigated everything and nothing came of it. Zerbib noted it was undisputed that Doe actually had a bruise on her thigh when this incident occurred, which law enforcement could not see without pulling down her pants. Zerbib argued that, just like law enforcement, appellant had simply attempted to see Doe's bruise. Zerbib asserted that no crime had occurred.

*Quiroz* does not establish error in this matter because appellant received adequate notice of the government's theory in count 9 before closing arguments occurred. (See *Quiroz, supra*, 215 Cal.App.4th at pp. 70–71.) Appellant was not precluded in presenting his defense, and this record does not show or even reasonably suggest that the prosecution misled him. Instead, the defense was able to argue its position to the jury. As such, appellant's constitutional rights were not violated and reversal is not required. In any event, however, we also conclude that any presumed error was harmless.

### 3. Any presumed error was harmless.

As in *Quiroz*, we conclude that any presumed error was harmless even if the defense received improper late notice of the prosecution's theory in count 9. The defense had ample time to tailor its closing argument after the People made it clear that it believed appellant had made Doe undress herself as the basis for his lewd intent during the R & N Market incident. (See *Quiroz, supra*, 215 Cal.App.4th at p. 71.) Moreover, through Doe, the prosecution presented overwhelming evidence

46

that established appellant's guilt. It is apparent that appellant directed Doe to remove her pants in the parked vehicle for his own sexual interests, and he was interrupted when the sheriff's deputy surprised them. No reasonable explanation was provided that demonstrated or even suggested that Doe had a reason to lie regarding her father's actions. The prosecutor argued to the jury that Doe's demeanor in court was of a child who had been forcibly raped by her father.

Appellant attempted to convince the jury that he had not committed any of the charged crimes. The jury rejected the defense position and it clearly found Doe's testimony credible. Based on the totality of this record, we can declare that, even if a presumed federal constitutional error occurred, it is beyond any reasonable doubt that the error did not contribute to the verdict. (See *Chapman v. California* (1967) 386 U.S. 18, 24.) The prosecution overwhelmingly established appellant's guilt for all of the charged crimes, including those during the R & N Market incident. Therefore, reversal is not warranted of appellant's convictions in count 7, 8 and/or 9, and this claim fails. [Fn.18]

> [Fn.18] Appellant cites a series of opinions that stand for the proposition that adequate notice of a prosecution theory may come from the evidence presented at the preliminary hearing. (*See, e.g.*, *People v. Jenkins* (2000) 22 Cal.4th 900, 1024; *People v. Scott* (1991) 229 Cal.App.3d 707, 717.) We need not analyze those opinions because the notice provided to appellant in this matter came before closing arguments, and the prosecution did not mislead or ambush the defense. (See *Quiroz, supra*, 215 Cal.App.4th at pp. 70–71.) In any event, even if appellant received improper late notice, it is beyond any reasonable doubt that any presumed error was harmless.

*Garza*, 2023 WL 415659, at *32–35.

### a. Legal Standard

"[F]or purposes of AEDPA's 'clearly established Federal law' requirement, it is 'clearly established' that a criminal defendant has a right, guaranteed by the Sixth Amendment and applied against the states through the Fourteenth Amendment, to be informed of any charges against him, and that a charging document, such as an information, is the means by which such notice is provided. Gautt v. Lewis, 489 F.3d 993, 1002–03 (9th Cir. 2007) (citing Cole v. Arkansas, 333 U.S. 196, 201 (1948); In re Oliver, 333 U.S. 257, 273 (1948); De Jonge v. Oregon, 299 U.S. 353, 362 (1937)). "To satisfy this constitutional guarantee, the charging document need not contain a citation to the specific statute at issue; the substance of the information, however, must in some appreciable way apprise the defendant of the charges against him so that he may prepare a defense accordingly." Id., at 1004. To satisfy the Sixth Amendment, "an information [must] state the elements of an offense charged with sufficient clarity to apprise a defendant of what he must be prepared to defend against." Givens v. Housewright, 786 F.2d 1378, 1380 (9th

1   Cir. 1986) (citing Russell v. United States, 369 U.S. 749, 763-64 (1962)).  "An explicit citation to

2   the precise statute at issue is best, but a 'brief factual recitation in the information' can also

3   suffice."  Id. at 1381.

4                                    b.  Analysis

5           In this case, as to Count 9 the information charged Petitioner as follows:

6           Between June 4, 2011, and December 31, 2011, said defendant(s), ANGEL
            MIGUEL GARZA, did commit a FELONY, namely: a violation of Section
7           288(b)(1) of the Penal Code of the State of California, in that said defendant(s):
            did willfully, unlawfully, and lewdly commit a lewd and lascivious act upon and
8           with the body or certain parts and members thereof of Jane Doe, a child under the
            age of fourteen years, with the intent of arousing, appealing to, or gratifying the
9           lust, passions, and sexual desires of the said defendant(s) and/or the said child, by
            use of force, violence, duress, menace, or threat of great bodily harm, to wit, the
10          R&N incident.

11  (Doc. 34-1 at 72.)

12          Petitioner was thus apprised he was accused of a lewd and lascivious act on Jane Doe, as

13  well as the specific statute of the California Penal Code.  He was also informed of the specific

14  incident in question that supported the accusation, "the R&N incident."  A fairminded jurist could

15  conclude that Petitioner's due process rights were satisfied, insofar as Petitioner was adequately

16  informed of the charge.

17          Petitioner contends the prosecution was required to precisely advise him of its theory of

18  liability, specifically, what the prosecution's theory was concerning the element of "touching" for

19  lewd and lascivious conduct.  However, there is no Supreme Court authority requiring the

20  prosecution to divulge its theory of liability.  In any event, Petitioner was apprised of the

21  prosecution's theory of constructive touching at the close of the prosecution's case when he

22  brought a motion for acquittal. Petitioner thus knew the prosecutor's theory prior to his

23  presentation of his defense thereby satisfying due process requirements. Gault, 489 F.3d at 1010

24  ("the purpose behind a defendant's constitutional right to notice is 'to enable him to prepare his

25  defense,'") (citing James v. Borg, 24 F.3d 20, 24 (9th Cir. 1994)).  If he desired additional time or

26  additional witnesses, he could have raised the issue with the trial court and sought a continuance

27  or moved to call witnesses.  He did not do so.

28          After the trial court modified the jury instruction to correctly reflect state law, Petitioner

1   again did not seek a continuance or make a request to recall witnesses.  A fairminded jurist could

2   therefore conclude that Petitioner was not denied a fair opportunity to defend against the charge.

3   See Gray v. Netherland, 518 U.S. 152, 167 (1996) ("[F]or petitioner to prevail on his notice-of-

4   evidence claim, he must establish that due process requires that he receive more than a day's

5   notice of the Commonwealth's evidence. He must also establish that due process required a

6   continuance whether or not he sought one, or that, if he chose not to seek a continuance,

7   exclusion was the only appropriate remedy for the inadequate notice. We conclude that only the

8   adoption of a new constitutional rule could establish these propositions.").

9        Petitioner also fails to establish prejudice, that is, "a substantial and injurious effect or

10  influence in determining the jury's verdict." Gautt, 489 F.3d at 1016 (quoting Brecht, 507 U.S. at

11  623). As noted by the appellate court, the evidence against Petitioner was overwhelming. Garza,

12  2023 WL 415659, at * 35.  Petitioner's defense was that he did not commit any of the charged

13  offenses. The jury clearly found the victim's testimony credible, finding Petitioner guilty of all

14  charged crimes.  Petitioner fails to demonstrate that any late notice in asserting the prosecution's

15  theory of "touching" as to Count 9 had a substantial and injurious effect or influence on the jury's

16  verdict.

17              7.   Claim Seven

18       In his next ground for relief, Petitioner alleges the trial court erred in instructing the jury

19  with CALCRIM No. 1193, because it misstated the law and permitted the jury to use CSAAS

20  evidence to find Petitioner guilty. Petitioner raised this claim on direct review. The appellate

21  court rendered the last reasoned decision denying the claim as follows:

> Appellant argues that CALCRIM No. 1193, which instructs a jury about CSAAS,
> is legally erroneous because it permits jurors to find guilt through this syndrome.
> He asserts that this instruction violates California law, it deprived him of a fair
> trial, and it reduced the prosecution's burden of proof.
>
> **A. Standard of review.**
>
> Instructional errors are questions of law, which we review de novo. (*People v.
> Guiuan* (1998) 18 Cal.4th 558, 569–570; *People v. Jandres* (2014) 226
> Cal.App.4th 340, 358.) We must ascertain the relevant law and determine whether
> the given instruction correctly stated it. (*People v. Kelly, supra*, 1 Cal.4th at pp.
> 525–526.)

49

1    We review a challenged jury instruction "in the context of the instructions as a
2    whole and the trial record to determine whether there is a reasonable likelihood the
     jury applied the instruction in an impermissible manner. [Citation.]" (*People v.
3    Houston* (2012) 54 Cal.4th 1186, 1229.) In that context, we must determine if it is
     reasonably likely the jurors understood the instruction as appellant suggests.
4    (*People v. Nem* (2003) 114 Cal.App.4th 160, 165.) We should consider the
     language of the instruction, the entire trial record, and the arguments of counsel.
5    (*Ibid.*)

6         **B. Analysis.**

7    Our Supreme Court has noted that expert testimony about CSAAS is needed to
     enlighten jurors regarding commonly held misconceptions about child sexual
8    abuse, and to explain why abused children may engage in apparent self-
     impeaching behavior. (*People v. McAlpin, supra*, 53 Cal.3d at p. 1301.) A vast
9    majority of courts approve of such expert testimony as rebuttal evidence. (*Ibid.*)

10   CALCRIM No. 1193 is based on *Bowker, supra*, 203 Cal.App.3d 385. The *Bowker*
     court held that a jury "must be instructed simply and directly" that an expert's
11   testimony regarding CSAAS "is not intended and should not be used to determine
     whether the victim's molestation claim is true. The jurors must understand that
12   CSAAS research approaches the issue from a perspective opposite to that of the
     jury. CSAAS *assumes* a molestation has occurred and seeks to describe and
13   explain common reactions of children to the experience. [Citation.] The evidence
     is admissible *solely* for the purpose of showing that the victim's reactions as
14   demonstrated by the evidence are not inconsistent with having been molested."
     (*Bowker, supra*, 203 Cal.App.3d at p. 394.)

15   In the present matter, the court instructed the jurors that they had heard testimony
     from Urquiza regarding CSAAS, and his testimony was "not evidence" that
16   appellant had "committed any of the crimes" in this matter. The jurors were
     instructed that they could consider this evidence "only in deciding whether or not"
17   Doe's conduct "was not inconsistent with the conduct of someone who has been
     molested, and in evaluating the believability of her testimony." This language
18   substantially mirrors the form language appearing in CALCRIM No. 1193.

19   Appellant concedes that this instruction correctly stated that Urquiza's testimony
     was not evidence that he (appellant) had committed any of the charged crimes.
20   However, appellant asserts that the "very next sentence" holds a contradiction
     because it told the jurors they could consider this evidence in evaluating Doe's
21   credibility. Appellant maintains that it is impossible to use CSAAS testimony to
     evaluate Doe's credibility, when she provided the only evidence that he was guilty.
22   He argues that this instruction "eviscerated any limiting effect" it had in telling the
     jurors that the CSAAS testimony was not evidence he had committed the charged
23   crimes.

24   According to appellant, CALCRIM No. 1193 has three flaws. First, it is
     impossible to separate a complaining witness's credibility from whether their
25   molestation allegations are true. Appellant argues that a juror who used the
     CSAAS testimony to evaluate Doe's credibility would necessarily use that same
26   evidence to evaluate whether appellant committed the charged crimes.

27   Second, appellant notes that this instruction has a double negative, which he
     asserts is confusing. He argues that the phrase "not inconsistent with" means
28   "consistent with." Thus, appellant contends that jurors could use Urquiza's

                                        50

testimony to make a diagnosis and conclude that, because Doe's conduct shows she suffered from CSAAS, her claims of sexual abuse must be true.

Third, appellant claims that this instruction is not impartial, and it is fundamentally argumentative because it expressly permits jurors to use CSAAS evidence to determine if the complaining witness's behavior is consistent with that of a sexual abuse victim, but it ignores a defense inference that the same behavior might suggest falsity. Appellant argues that, without this instruction, a juror may have viewed Doe's behavior in a very different light. Doe delayed reporting the abuse, she was inconsistent and vague about some details, and she appeared happy. Appellant contends that the trial evidence supported an inference that Doe was lying to help her mother in a possible custody dispute. According to appellant, CALCRIM No. 1193 only favors the prosecution's narrative, and it does not offer jurors the option of rejecting CSAAS's explanation for Doe's conduct.

Appellant relies on *People v. Housley* (1992) 6 Cal.App.4th 947 (*Housley*). In *Housley*, Division Two of the First District Court of Appeal, held that, "because of the potential for misuse of CSAAS such evidence, and the potential for great prejudice to the defendant in the event such evidence is misused, it is appropriate to impose upon the courts a duty to render a sua sponte instruction limiting the use of such evidence. Accordingly, in all cases in which an expert is called to testify regarding CSAAS we hold the jury must sua sponte be instructed that (1) such evidence is admissible solely for the purpose of showing the victim's reactions as demonstrated by the evidence are not inconsistent with having been molested; and (2) the expert's testimony is not intended and should not be used to determine whether the victim's molestation claim is true." (*Housley, supra*, 6 Cal.App.4th at pp. 958–959.) *Housley* concluded that such a limiting instruction had not been given in its matter, but the instructional error was harmless. The CSAAS expert had twice told the jury that she had not met the victim and had no knowledge of the case. The expert's testimony "was couched in general terms, and described behavior common to abused victims as a class, rather than any individual victim." (*Id*. at p. 959.) The appellate court concluded it was unlikely the jury interpreted the expert's statements as support for the victim's credibility. (*Ibid*.) Moreover, other witnesses testified about why the victim had retracted her claims of molestation. The *Housley* court determined it was not reasonably probable the defendant would have received a more favorable verdict if an appropriate limiting instruction had been given. (*Ibid*.)

Appellant contends that, because his jurors were told that they could consider Urquiza's testimony in evaluating Doe's credibility, it is "almost certain" the jurors would have utilized the CSAAS testimony in an impermissible way to find him guilty.

At least two published opinions have already disposed of arguments similar to those which appellant raises here. In *People v. Gonzales* (2017) 16 Cal.App.5th 494 (*Gonzales*), Division Six of the Second Appellate District stated that a reasonable juror would understand CALCRIM No. 1193 to mean that the jury can use the expert's testimony to determine that the minor victim's behavior does not mean she lied when she said she was abused. (*Gonzales, supra*, at p. 504.) A jury would understand it could not use the expert's testimony to conclude that the child was, in fact, molested. (*Ibid*.) CSAAS evidence merely neutralizes the victim's apparently self-impeaching behavior. (*Ibid*.) "Thus, under CALCRIM No. 1193, a juror who believes [the expert's] testimony will find both that [the child's] apparently self-impeaching behavior does not affect her believability one way or the other, and that the CSAAS evidence does not show she had been molested.

51

1    There is no conflict in the instruction." (*Ibid.*)

2    In *People v. Munch* (2020) 52 Cal.App.5th 464 (*Munch*), Division Six of the
     Second Appellate District cited its prior *Gonzales* opinion with continued
3    approval. (*Munch, supra*, 52 Cal.App.5th at p. 474.) *Munch* rejected arguments
     that CALCRIM No. 1193 reduced the prosecution's burden of proof, or that the
4    jurors may have improperly used it to find guilt. (*Munch, supra*, at p. 474.)

5    Appellant argues that *Gonzales* is not convincing authority. According to
     appellant, *Gonzales* did not address the double negative appearing in CALCRIM
6    No. 1193, and *Gonzales* "glossed over" the concern that a complaining victim's
     credibility cannot be separated from establishing a defendant's guilt. Moreover,
7    appellant contends that *Gonzales* is factually distinguishable from the present
     matter. Appellant maintains that Urquiza responded to hypotheticals and provided
8    conclusions that included facts similar to this case.

9    We reject all of appellant's arguments. CSAAS was admissible to show that Doe's
     reactions were not inconsistent with having been molested. (See *Bowker, supra*,
10   203 Cal.App.3d at p. 394.) Appellant's jury was explicitly instructed that Urquiza's
     testimony could not be used as evidence that appellant was guilty, but only in
11   evaluating Doe's credibility. Urquiza himself told the jury that CSAAS is not a
     diagnostic tool and its purpose was to educate. Urquiza made it clear that a
12   presumption exists with CSAAS that the child has been sexually abused, and it
     describes "common characteristics of that child." However, the jury learned that
13   this syndrome has no applicability if a child has not been sexually abused.

14   Through other instructions, the jury was informed that appellant was presumed
     innocent, and the prosecution bore the burden to prove his guilt beyond a
15   reasonable doubt. For each of the charged crimes, the jurors were told that the
     prosecution had to prove each of the required elements, which were provided. The
16   jurors were told that they could disregard Urquiza's expert testimony, and they
     were not required to accept it as true or correct.
17
     During closing argument, the prosecutor informed the jury that Urquiza was not
18   there to tell them whether he believed Doe. Instead, his testimony was about his
     prior treatment of abused children, and the trends that have been observed. The
19   prosecutor asked the jury to consider Urquiza's testimony when considering how
     Doe handled everything and appeared emotionally in light of appellant's criminal
20   behavior with her.

21   Zerbib reminded the jurors that Urquiza said the purpose of his testimony was not
     to diagnose or say that abuse had happened. According to Zerbib, the CSAAS
22   evidence was to help explain some of Doe's behavior if she had been abused.
     Zerbib, however, argued that the prosecution had not proven beyond a reasonable
23   doubt that the alleged molestation had occurred.

24   Based on our independent review, the instruction which appellant's jury received
     pursuant to CALCRIM No. 1193 correctly stated the law. The jurors were
25   explicitly told that this evidence could not be used to establish appellant's guilt. It
     is not reasonably likely the jury would have applied CALCRIM No. 1193 in an
26   impermissible way. The jurors learned that CSAAS evidence is not a diagnostic
     tool, but it provided an explanation into why Doe may have engaged in apparently
27   self-impeaching behavior. Appellant's jury would not have reasonably believed it
     could use Urquiza's testimony to conclude that Doe was in fact molested.
28   Accordingly, we reject appellant's arguments that he suffered an unfair trial or that

1    the prosecution's burden of proof was lowered. This record does not show that
     instructional error occurred, and this claim fails. [Fn.19]

2
          [Fn.19] Because instructional error did not occur, we do not address appellant's
3         arguments regarding prejudice.

4    <u>Garza</u>, 2023 WL 415659, at *41.

5                        a.   <u>Legal Standard</u>

6          A claim that a jury instruction violated state law is not cognizable on federal habeas

7    review.  <u>Estelle v. McGuire</u>, 502 U.S. 62, 71-72 (1991).  To obtain federal collateral relief for

8    errors in the jury charge, a petitioner must show that the ailing instruction by itself so infected the

9    entire trial that the resulting conviction violates due process. <u>Id</u>. at 72; <u>Cupp v. Naughten</u>, 414

10   U.S. 141, 147 (1973); <u>see also</u> <u>Donnelly v. DeChristoforo</u>, 416 U.S. 637, 643 (1974) ("'[I]t must

11   be established not merely that the instruction is undesirable, erroneous or even "universally

12   condemned," but that it violated some [constitutional right].'").  The instruction may not be

13   judged in artificial isolation, but must be considered in the context of the instructions as a whole

14   and the trial record.  <u>See</u> <u>Estelle</u>, 502 U.S. at 72.  In other words, the court must evaluate jury

15   instructions in the context of the overall charge to the jury as a component of the entire trial

16   process.  United <u>States v. Frady</u>, 456 U.S. 152, 169 (1982) (citing <u>Henderson v. Kibbe</u>, 431 U.S.

17   145, 154 (1977)); <u>Prantil v. California</u>, 843 F.2d 314, 317 (9th Cir. 1988); <u>see</u>, <u>e.g.</u>, <u>Middleton v.</u>

18   <u>McNeil</u>, 541 U.S. 433, 434–35 (2004) (per curiam) (no reasonable likelihood that jury misled by

19   single contrary instruction on imperfect self-defense defining "imminent peril" where three other

20   instructions correctly stated the law).

21         In addition, a habeas petitioner is not entitled to relief unless the instructional error "'had

22   substantial and injurious effect or influence in determining the jury's verdict.'"  <u>Brecht v.</u>

23   <u>Abrahamson</u>, 507 U.S. 619, 637 (1993) (quoting <u>Kotteakos v. United States</u>, 328 U.S. 750, 776

24   (1946)).  In other words, state prisoners seeking federal habeas relief may obtain plenary review

25   of constitutional claims of trial error, but are not entitled to habeas relief unless the error resulted

26   in "actual prejudice."  <u>Id</u>. (citation omitted); <u>see</u> <u>Calderon v. Coleman</u>, 525 U.S. 141, 146–47

27   (1998).

28
                              53

1

b. <u>Analysis</u>

2          The state court determined that the instruction was correct under California law.  This

3   Court is bound by the state court's interpretation of state law, including state law regarding the

4   purpose of CSAAS evidence and the meaning of CALCRIM No. 1193.  <u>Bradshaw v. Richey</u>, 546

5   U.S. 74, 76 (2005) ("A state court's interpretation of state law, including one announced on direct

6   appeal of the challenged conviction, binds a federal court sitting in habeas corpus.").  Thus,

7   Petitioner's claim as a violation of state law must fail.  The state court also determined that the

8   instruction did not shift the burden to Petitioner in violation of his constitutional rights.

9   Therefore, the only question before the Court is whether the state court's determination was

10  objectively reasonable.

11          Petitioner contends that CALCRIM No. 1193 misstates the law and reduces the

12  prosecution's burden by allowing jurors to use CSAAS evidence to determine whether the abuse

13  occurred.  Petitioner is incorrect. As the state court noted, jurors were instructed according to

14  California law that the expert's testimony was <u>not</u> evidence that Petitioner had committed any of

15  the crimes, and that they could <u>only</u> consider the evidence in deciding whether or not the victim's

16  conduct was not inconsistent with the conduct of someone who has been molested and in

17  evaluating the believability of her testimony.  As the state court noted in <u>People v. Gonzalez</u>, 16

18  Cal.App.5th 494, 504 (2017),

19          [a] reasonable juror would understand CALCRIM No. 1193 to mean that the jury
            can use [the expert's] testimony to conclude that [the victim's] behavior does not
20          mean she lied when she said she was abused. The jury also would understand it
            cannot use [the expert's] testimony to conclude [the victim] was, in fact, [sexual
21          abused]. The CSAAS evidence simply neutralizes the victim's apparently self-
            impeaching behavior. Thus, under CALCRIM No. 1193, a juror who believes [the
22          expert's] testimony will find both that [the victim's] apparently self-impeaching
            behavior does not affect her believability one way or the other, and that the
23          CSAAS evidence does not show she had been [sexually abused].

24  The jury was also instructed on the presumption of innocence and the standard of reasonable

25  doubt.  There is no reasonable likelihood that the jury applied CALCRIM No. 1193 in a way that

26  shifted the prosecution's burden of proof.  The state court rejected of the claim was neither

27  contrary to, nor an unreasonable application of, clearly established Supreme Court authority.  The

28  claim should be denied.

54

8. Claim Eight

Petitioner next claims the evidence was insufficient to support the guilty findings as to multiple counts: 1) Count 7, kidnapping for purpose of molestation; 2) Count 9, aggravated molestation; and 3) Count 1, sexual intercourse/sodomy with victim ten years old or younger. This claim was also raised on direct appeal. In a reasoned determination, the appellate court rejected the claims as follows:

**IX. Substantial Evidence Supports the Conviction In Count 7.**

In count 7, appellant was convicted of kidnapping a child under the age of 14 years based on a false promise or misrepresentation in violation of section 207, subdivision (b). The verdict form referred to this crime as part of the R & N Market incident. For this conviction, appellant was sentenced to a consecutive subordinate determinate term of three years four months.

Appellant argues that his conviction in count 7 must be reversed for insufficient evidence.

*A. Standard of review.*

When considering a challenge to the sufficiency of the evidence to support a conviction, we review the record in the light most favorable to the judgment and decide whether it contains substantial evidence from which a reasonable finder of fact could make the necessary finding beyond a reasonable doubt. The evidence must be reasonable, credible and of solid value. We presume every inference in support of the judgment that the finder of fact could reasonably have made. We do not reweigh the evidence or reevaluate witness credibility. We cannot reverse the judgment merely because the evidence could be reconciled with a contrary finding. (*People v. D'Arcy* (2010) 48 Cal.4th 257, 293.) The standard of review is the same when the conviction is based primarily on circumstantial evidence. (*People v. Clark* (2016) 63 Cal.4th 522, 625.)

*B. Background.*

The conviction in count 7 stemmed from the incident on July 1, 2011, wherein appellant had asked Doe to drive to the R & N Market with him. Appellant did not promise her anything, but she testified at trial that she "most likely" would have received something when she got to the store. She willingly went with appellant. Instead of going to the market, however, appellant drove her to an isolated location near an orchard. He parked and directed her to remove her pants, which she did.

*C. Analysis.*

Appellant contends that the prosecution failed to establish that (1) he took Doe for an illegal purpose; (2) he tricked her into going with him to the market; and/or (3) he had any lewd intent. He maintains that this conviction is based only on supposition, and he had a parental right to examine Doe for a bruise inflicted by Doe's mother, his then estranged wife. He requests that this court reverse his kidnapping conviction in count 7.

55

1    We disagree that reversal is required. Appellant's assertions are wholly without
     merit and substantial evidence supports this conviction.

2

3    A father ordinarily cannot kidnap his own child when he is entitled to custody.
     (*People v. Senior* (1992) 3 Cal.App.4th 765, 781.) However, a father may be liable
     for kidnapping if he exercises custodial rights for an illegal purpose. (*Ibid.*) In

4    relevant part, section 207, subdivision (b), makes it a crime when a person, for the
     purpose of committing a lewd act, uses misrepresentation or false promises to

5    convince a child under the age of 14 years to go to another part of the same
     county.

6

7    In the present matter, the prosecutor argued to the jury that appellant took Doe
     after misrepresenting to her where they were going. Reasonable inferences may be
     drawn from this record that appellant took Doe to the orchard for a lewd purpose.

8    Doe thought she would get a toy or candy when appellant asked her to go to the
     market. Instead of going to the market, however, appellant parked in a rural area

9    and he told Doe to remove her pants. She told the jury that she was "confused" and
     "scared" when her father told her to take off her pants. She said that his request

10   was not "normal" for a father to ask of his daughter.

11   Doe testified that, when they were driving just before this incident occurred,
     appellant had not asked her to show him the bruise. Instead, he just told her to

12   remove her pants. The deputy saw very strange behavior when he arrived on the
     scene. Both appellant and Doe were positioned out of sight inside the vehicle, and

13   both of their heads popped up. Doe immediately moved her body in a way that
     suggested she was putting on pants. The circumstantial evidence strongly suggests

14   that appellant was trying to hide his behavior with his daughter, and he could not
     provide a reasonable explanation why he was allegedly checking his daughter's

15   bruise in a rural area and not at home. Law enforcement discovered that both seats
     in appellant's vehicle had been in a reclined position when the deputy surprised

16   them.

17   Appellant notes it is undisputed that Doe actually had a bruise on her upper leg
     when this crime occurred. He raises numerous arguments in an effort to show that

18   an inference may be drawn from the record that he was lawfully exercising his
     parental right to examine Doe for an innocent reason. Those arguments are

19   unpersuasive.

20   From all of the trial evidence, a reasonable jury could have concluded beyond any
     reasonable doubt that appellant enticed Doe or made a false promise that they were

21   going to the market, but, instead, he intended to drive her to that isolated location
     with the lewd intent to gratify himself, and he did gratify himself. Although

22   appellant can point to other possible interpretations that may be drawn from the
     record regarding his intent, that does not establish an insufficiency of the evidence

23   for this conviction. Rather, the jury had ample evidence to find appellant guilty in
     count 7 beyond any reasonable doubt, and we will not reverse the judgment merely

24   because the evidence could be reconciled with a contrary finding. (See *People v.
     D'Arcy, supra*, 48 Cal.4th at p. 293.) Substantial evidence supports a kidnapping

25   conviction under section 207, subdivision (b), and this claim is without merit.

26   **X. Substantial Evidence Supports the Conviction in Count 9.**

27   In count 9, appellant was convicted of committing a lewd and lascivious act upon
     Doe in violation of section 288, subdivision (b)(1). This was part of the R & N

28   Market incident. Appellant was sentenced to an upper term of 10 years for this

56

conviction, which was doubled based on his prior strike.

During closing argument, the prosecutor asserted that appellant caused Doe to touch herself when he ordered her to remove her pants. According to the prosecutor, appellant intended to gratify himself, and Doe was scared. Doe did not know what was happening. The prosecutor urged the jury to find appellant guilty in count 9.

Appellant argues that this conviction must be reversed due to insufficient evidence. He contends that Doe did not describe any touching when she was with him in the vehicle in the orchard. He asserts that a constructive touching theory lacks evidentiary support because Doe was not ordered to touch herself in a sexual way, and she was simply asked to remove her pants in the context of a discussion about a bruise that was not otherwise visible. Appellant also asserts that nothing shows force and/or duress. He requests that this court reverse his conviction in count 9.

We disagree that reversal is warranted. Section 288, subdivision (a), makes it a felony whenever a person willfully and lewdly commits any lewd or lascivious act upon a child who is under the age of 14 years with the intent of arousing, appealing to, or gratifying the lust, passions, or sexual desires of that person or the child. Various appellate courts have upheld a constructive touching theory as a basis to find a lewd and lascivious act. (*Meacham, supra*, 152 Cal.App.3d at p. 153; *Austin, supra*, 111 Cal.App.3d at p. 115.) The California Supreme Court has impliedly endorsed the constructive touching doctrine. (See *People v. Memro, supra*, 11 Cal.4th at p. 872; *People v. Mickle, supra*, 54 Cal.3d at p. 176.)

Section 288, subdivision (b), imposes a sentencing enhancement if the person who commits the lewd act uses force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the victim or another person. For purposes of this statute, the word "duress" means a direct or implied threat of force, violence, danger, hardship or retribution sufficient to coerce a reasonable person of ordinary susceptibilities to (1) perform an act which otherwise would not have been performed or (2) acquiesce in an act to which one otherwise would not have submitted. (*People v. Veale* (2008) 160 Cal.App.4th 40, 46.) The entire circumstances, including the victim's age and her relationship to the defendant, are factors to be considered in examining the existence of duress. (*Ibid.*)

Here, appellant's jury was instructed on the definition of duress, which was consistent with the definition summarized above. A reasonable jury could have concluded beyond any reasonable doubt that appellant compelled Doe to remove her pants for his own sexual gratification, and she did so because of duress. Doe was only 10 years old when this incident occurred, making her far too young to resist him. Appellant drove her to a rural location near an orchard. This incident ended when a deputy sheriff unexpectedly drove up and surprised appellant, who popped up from the front passenger seat, which was fully reclined. The deputy saw Doe "shimmying her shoulders and torso" as if she were putting on pants. Appellant told her not to say anything, and he made a "mean face" at her. Doe testified that she had been scared. Appellant could not provide a reasonable explanation to the deputy why Doe's pants had been pulled down in a rural location.

Based on the entire circumstances, the jury could have reasonably found appellant guilty of violating section 288, subdivision (b). Appellant ordered Doe to remove her pants while they were parked in a rural location. Given her very young age and

1    his authority over her, the jury could have reasonably concluded that Doe felt
      compelled to comply based on duress. Moreover, the totality of the evidence
2    amply supports the jury's conclusion that appellant directed Doe to remove her
      pants for his own sexual gratification. Indeed, the evidence strongly suggests that
3    appellant would have continued his lewd act had the deputy not interrupted him.

4    Appellant cites *People v. Espinoza* (2002) 95 Cal.App.4th 1287 (*Espinoza*). This
      opinion does not assist him. In *Espinoza*, the defendant molested his 12-year-old
5    daughter on multiple occasions in her bedroom in the hours just after midnight.
      (*Espinoza, supra*, at pp. 1292–1293.) The appellate court held that insufficient
6    evidence supported a finding of duress. According to *Espinoza*, it was not enough
      that the defendant was the victim's father and larger than her, or that she was afraid
7    of him and had a limited intellectual level. (*Id*. at p. 1321.) Instead, duress required
      evidence showing that the victim's participation was impelled, at least in part, by
8    an implied threat. (*Ibid*.) No evidence showed that the defendant's lewd acts and
      attempt at intercourse were accompanied by any threats. While it was clear that the
9    victim was afraid of her father, no evidence was introduced to show that this fear
      was based on anything the defendant had done other than to continue to molest
10   her. According to *Espinoza*, it would be "circular reasoning to find that her fear of
      molestation established that the molestation was accomplished by duress based on
11   an implied threat of molestation." (*Ibid*.)

12   *Espinoza* is distinguishable from the present matter. Unlike what occurred in
      *Espinoza*, appellant did not approach Doe in her bedroom but, rather, drove her to
13   a rural area and told her to remove her pants. Doe testified that she was scared
      during this incident because appellant "is a scary person." She later testified that
14   she was scared because appellant had been "violent towards my mom, and my
      brothers, and me."
15
16   Doe was about two years younger than the victim in *Espinoza*. Because of Doe's
      younger age, she was more susceptible to being coerced through fear, and she was
17   even more susceptible to appellant's position of authority over her. Doe expressed
      a clear concern about appellant's past acts of violence committed on her, her
18   mother, and her brothers. *Espinoza* does not establish that reversal is required, and
      sufficient evidence exists in this record to support the jury's conviction in count 9.
19   Appellant's arguments are unpersuasive, and we will not reverse this conviction.

20   **XII. Substantial Evidence Supports the Conviction in Count 1.**

21   In count 1, the jury convicted appellant of intercourse with Doe when she was 10
      years old or younger in violation of section 288.7, subdivision (a). This was the
22   living room incident. Appellant was sentenced to prison for 50 years to life for this
      conviction, plus an additional consecutive five years for his prior serious felony
23   conviction.

24   Appellant asserts that insufficient evidence supports this conviction. He argues that
      substantial evidence did not establish that Doe was 10 years old when this crime
25   occurred, and he seeks reversal of this conviction.

26          ***A. Background.***

27   At the conclusion of the prosecution's case-in-chief, the defense sought a judgment
      of acquittal (§ 1118.1). In part, appellant asked the court to dismiss counts 1 and 4
28   on the grounds that no evidence showed that Doe was 10 years old or younger
      when those offenses were alleged to have occurred. [Fn.20] The prosecutor

58

admitted that the evidence showed Doe was older than 10 years old at the time the conduct alleged in count 4 had occurred. However, the prosecutor noted that Doe had testified that she was either 10 or 11 years old during the alleged incident charged in count 1. The court granted appellant's motion as to count 4, and it denied it for all remaining counts.

> [Fn.20] Count 4 had alleged that appellant "engaged in sexual intercourse and sodomy" with Doe, who was 10 years of age or younger, between June 4, 2011, and June 3, 2012, in violation of section 288.7, subdivision (a).

On rebuttal, the prosecutor recalled Doe to testify. Doe told the jury that she was 10 years old during the R & N market incident. The prosecutor then questioned her about her age during the living room incident, which is the basis for the charge in count 1. Doe testified that she thought she was still 10 years old when that incident occurred because she had summer school that year. Her birthday is in June and she was in the fifth grade. She testified that she remembered because her summer school teacher had been "on [her]" because her grades had started to drop. Doe answered "Yes" when the prosecutor asked whether Doe had remembered that she was 10 years old the first time appellant "actually put his private part inside your private part?"

During cross-examination, Doe confirmed that she was 10 years old during the living room incident, and she said she was "[p]ositive" about that. Doe acknowledged that, in her trial testimony the day before, she had stated that she could have been 10 or 11 years old when this incident happened. She explained that she had "sat down and calendared" how old she was each time she had entered a new grade. Because her birthday was in June, she testified that she started summer school around 10 years of age, and she was 10 years old when she entered the fifth grade. She claimed that she did this calculation on her own without knowing that she was going to testify again during rebuttal. She confirmed that, despite previously saying she was maybe 10 or 11 years old during the living room incident, it was her testimony that she had been 10 years old at the time.

### B. Analysis.

Appellant argues that Doe's testimony does not amount to substantial evidence because she provided contradictions regarding her age when the living room incident occurred. Appellant notes that, during her MDIC interview and her earlier trial testimony, Doe had believed she was 10 or 11 years old. During her rebuttal testimony, Doe stated that she "thinks" she was 10 years old when this occurred, and appellant argues that such testimony equals a "maybe." Appellant asserts that Doe did not connect the living room incident to her summer school attendance. He maintains that Doe's testimony is legally insufficient to support the conviction in count 1. We disagree.

In *United States v. Kenyon* (8th Cir. 2007) 481 F.3d 1054 (*Kenyon*), an opinion which appellant cites, the defendant was convicted of four counts of aggravated sexual abuse of a child. (*Kenyon, supra*, 481 F.3d at p. 1058.) For one count, the victim testified that the defendant had "maybe" put his penis in her mouth twice, but she did not know. (*Id.* at p. 1068.) At the conclusion of her testimony, the trial court directly asked the victim if she knew whether the defendant had committed one or two acts of oral copulation, and the victim had responded, "No." (*Ibid.*) The federal appellate court held that this was insufficient evidence to support two convictions. The victim had been unable to say that the oral copulation had occurred on two separate occasions. Her testimony that "maybe" it occurred twice,

1
2

which was uncorroborated by any independent evidence of such encounters, did not represent substantial evidence. (*Ibid*.) The court reversed one of the defendant's convictions. (*Ibid*.)

3
4
5
6
7

*Kenyon* does not assist appellant. A conviction under section 288.7, subdivision (a), requires proof that a person 18 years of age or older engaged in sexual intercourse or sodomy with a child who was 10 years of age or younger. Although Doe initially stated she was either 10 or 11 years old when the living room incident occurred, she later clarified in rebuttal testimony that she was 10 years old when this crime happened. She said she was positive that she had been 10 years old, and she explained how she had calculated her age. During closing argument, the prosecutor asserted to the jury that Doe was 10 years old when this crime occurred because Doe had ultimately remembered her age from summer school.

8
9
10
11
12
13
14

Doe's testimony was sufficient by itself to establish her age. (See Evid. Code, § 411 [the direct evidence of one witness is sufficient for proof of any fact].) Although appellant can point to credibility concerns surrounding Doe's testimony regarding her age when the living room incident occurred, we will not disturb the jury's finding in count 1 because we will not reweigh her credibility. (See *People v. D'Arcy, supra*, 48 Cal.4th at p. 293.) Doe's testimony was not demonstrably false. Thus, it was the jury's exclusive role to resolve this factual dispute. (*People v. Hovarter* (2008) 44 Cal.4th 983, 996; *People v. Cudjo* (1993) 6 Cal.4th 585, 609.) Unlike the situation in *Kenyon*, wherein the victim could not testify at all to establish a required fact, Doe was ultimately positive that she was 10 years old when the living room incident occurred. *Kenyon* is distinguishable and it does not establish error in this matter.

15
16

In rendering its verdict in count 1, it is apparent that the jury found Doe's testimony credible and accepted the prosecutor's argument. Doe's testimony was reasonable, credible and of solid value. Thus, substantial evidence supports the conviction in count 1, and this claim fails.

17    <u>Garza</u>, 2023 WL 415659, at *35-43.

18                              a.    <u>Legal Standard</u>

19        The law on sufficiency of the evidence is clearly established.  Pursuant to the United

20    States Supreme Court's holding in <u>Jackson v. Virginia</u>, 443 U.S. 307, the test on habeas review to

21    determine whether a factual finding is fairly supported by the record is "whether, after viewing

22    the evidence in the light most favorable to the prosecution, any rational trier of fact could have

23    found the essential elements of the crime beyond a reasonable doubt."  <u>Jackson</u>, 443 U.S. at 319;

24    <u>see also</u> <u>Lewis v. Jeffers</u>, 497 U.S. 764, 781 (1990).  Thus, only if "no rational trier of fact" could

25    have found proof of guilt beyond a reasonable doubt will a petitioner be entitled to habeas relief.

26    <u>Jackson</u>, 443 U.S. at 324.  Sufficiency claims are judged by the elements defined by state law.  <u>Id.</u>

27    at 324, n. 16.

28        If confronted by a record that supports conflicting inferences, a federal habeas court "must

1    presume – even if it does not affirmatively appear in the record – that the trier of fact resolved any

2    such conflicts in favor of the prosecution, and must defer to that resolution." Id. at 326.

3    Circumstantial evidence and inferences drawn from that evidence may be sufficient to sustain a

4    conviction. Walters v. Maass, 45 F.3d 1355, 1358 (9th Cir. 1995).

5           After the enactment of the AEDPA, a federal habeas court must apply the standards of

6    Jackson with an additional layer of deference. Juan H. v. Allen, 408 F.3d 1262, 1274 (9th Cir.

7    2005). In applying the AEDPA's deferential standard of review, this Court must presume the

8    correctness of the state court's factual findings. 28 U.S.C. § 2254(e)(1); Kuhlmann v. Wilson,

9    477 U.S. 436, 459 (1986).

10          In Cavazos v. Smith, 565 U.S. 1, 2 (2011), the United States Supreme Court further

11   explained the highly deferential standard of review in habeas proceedings, by noting that Jackson

12          makes clear that it is the responsibility of the jury - not the court - to decide what
             conclusions should be drawn from evidence admitted at trial. A reviewing court
13           may set aside the jury's verdict on the ground of insufficient evidence only if no
             rational trier of fact could have agreed with the jury. What is more, a federal court
14           may not overturn a state court decision rejecting a sufficiency of the evidence
             challenge simply because the federal court disagrees with the state court. The
15           federal court instead may do so only if the state court decision was "objectively
             unreasonable."
16
             Because rational people can sometimes disagree, the inevitable consequence of
17           this settled law is that judges will sometimes encounter convictions that they
             believe to be mistaken, but that they must nonetheless uphold.
18

19   Id. at 2.

20                         b.      Analysis – Count 7

21          In Count 7, Petitioner was found guilty of kidnapping a child under 14 based on a false

22   promise or misrepresentation. In rejecting the claim, the state court determined that substantial

23   evidence supported the conviction. In his traverse, Petitioner argues he cannot be found guilty of

24   kidnapping his own child when he has legal custody of his child. This is incorrect under

25   California law.

26          While Petitioner is the victim's father, and ordinarily a father cannot kidnap his own child,

27   the state court noted a father can be found guilty of kidnapping if he exercises his custodial rights

28   for an illegal purpose. Here, the illegal purpose was to commit lewd and lascivious acts. The

1  evidence showed Petitioner took the victim to an isolated area near an orchard, despite having

2  enticed the victim to accompany him to the R&N Market. Once there, he directed her to remove

3  her pants, which she did. She stated she was scared and confused because the request was not

4  normal. Petitioner states he was only attempting to look at her bruise, but the victim testified that

5  he had not asked to look at her bruise. Both of their seats were in a reclined position, and both of

6  their heads popped up when the deputy surprised them. The victim then quickly struggled in her

7  seat as if trying to pull up her pants. When asked why Petitioner had taken her to a remote

8  location only to look at a bruise as he alleged, he could offer no reasonable explanation.  In his

9  traverse, Petitioner contends the incident had been previously investigated and no charges had

10  been put forth at the time. This is immaterial as a jury determined Petitioner guilty of the crime

11  beyond a reasonable doubt. Upon review of the state of the evidence, the Court finds that a

12  reasonable jury could have determined that Petitioner enticed the victim to come with him with a

13  false promise of going to the market, but instead intended to drive to a remote location for the

14  sole purpose of committing lewd acts to gratify himself.  A rational jurist could certainly

15  conclude that the state court decision rejecting Petitioner's claim was not unreasonable.

16            c.  <u>Analysis – Count 9</u>

17       In Count 9, Petitioner was convicted of committing a lewd and lascivious act during the

18  R&N Market incident discussed above.  Petitioner contends there was no evidence that he

19  touched the victim when they were parked in the orchard. The prosecutor, however, argued that

20  Petitioner was guilty of "constructive touching" as Petitioner compelled the victim to touch

21  herself when he ordered her to remove her pants in order to gratify himself.  Petitioner contended

22  that there was also insufficient evidence of a constructive touching because the victim was not

23  ordered to touch herself in a sexual way, only to remove her pants.

24       As noted by the state court, Cal. Penal Code § 288(a) makes it a felony for a person to

25  commit any lewd act on a child under 14 years of age with the intent to gratify himself or the

26  child.  The state court determined that under state law, a defendant may be found guilty of

27  violating this provision under a theory of "constructive touching."  The state court found that

28  Petitioner's act of demanding the victim remove her pants with lewd intent sufficed as a

"constructive touching" under California law. The appellate court noted several California cases upholding such a theory. A federal court is bound by a state court determination of state law. See Bonin v. Calderon, 59 F.3d 815, 841 (9th Cir.1995) (Because state courts are the ultimate expositors of state law, the federal courts are bound by their constructions and limited to deciding whether a conviction violates the Constitution, laws or treaties of the United States). Here, Petitioner compelled the victim to remove her pants while parked in a remote location. The victim testified that she was scared of Petitioner because he was a "very scary person" who had been "violent towards my mom, and my brothers, and me." A reasonable factfinder could have found that the victim was compelled to remove her pants out of duress, and as discussed above, the act of removing her pants was a lewd act intended to gratify Petitioner. Petitioner fails to show that the state court rejection was unreasonable.

Petitioner also raises for the first time a claim that there was insufficient evidence of lewd intent. Respondent correctly notes that the claim, while unexhausted, may be rejected as meritless. See 28 U.S.C. § 2254(b)(2). As noted by the state court, there was abundant evidence from which the jury could determine that Petitioner harbored lewd intent when he compelled the victim to remove her pants. They had driven to an isolated location near an orchard, they had reclined their seats to stay out of sight, Petitioner had directed the victim to take off her pants, the victim's pants were unbuttoned for about 10 minutes until law enforcement happened to drive up, and the victim quickly pulled her pants on when law enforcement surprised them. The victim testified that Petitioner had promised to take her to a market but driven her to an orchard instead. She further testified that Petitioner's directive to remove her pants while in a car in a remote location was not "something dads are supposed to do." A rational jurist could certainly find that Petitioner harbored lewd intent when he directed the victim to remove her pants. The unexhausted claim should be denied as well.

d. Analysis – Count 1

Petitioner contends there was insufficient evidence to support the conviction for sodomy or sexual intercourse with a child under 10. He argues that substantial evidence did not establish that the victim was 10 when the crime was committed. The record shows otherwise.

63

During an interview and her earlier testimony at trial, the victim stated she believed she was 10 or 11 years old at the time of the living room incident. During rebuttal, the victim stated she "thinks" she was 10 years old when the incident occurred.  On recall, however, the victim clarified that she was 10 years old when the living room incident occurred.  The victim stated she remembered that she was 10 years old at the time because she was in fifth grade and she had summer school that year. She remembered because her teacher had been concerned when her grades started to drop at that time.  On cross-examination, the victim stated she was positive she was 10 at the time, because she had calendared how old she was each time she entered a new grade.  The jury found the victim credible and resolved the inconsistencies in her testimony. It is not the function of a reviewing federal habeas court to reweigh the evidence and reassess the witness's credibility. In sum, the state court reasonably determined that the victim's testimony constituted sufficient evidence that she was 10 years old during the living room incident. Petitioner fails to demonstrate that no fairminded jurist would agree with the state court's conclusion that there was sufficient evidence of the victim's age.  The claim should be denied.

9.    <u>Claim Nine</u>

In his final claim for relief, Petitioner contends his sentence was grossly disproportionate and constitutes cruel and unusual punishment in violation of the Eighth Amendment. Petitioner also raised this claim on direct appeal.  The Fifth DCA denied the claim as follows:

> Appellant was sentenced to an indeterminate term of 55 years to life, along with a consecutive determinate term of 127 years six months. The trial court made all of the sentences consecutive. We have already explained that we will stay the sentences in counts 3, 11, 14 and 17. As modified, appellant is sentenced to an indeterminate prison sentence of 55 years to life, along with a consecutive determinate term of 88 years eight months.

> Appellant asserts that his original sentence represented cruel and/or unusual punishment under the federal and California Constitutions. He contends he has a de facto life sentence that does not serve a legitimate penal purpose and is disproportionate to his culpability. He seeks a remand for resentencing.

> We reject appellant's arguments. Neither his original sentence nor the current modified version represent cruel and/or unusual punishment under either the federal or state Constitutions.

> ***A. The claim under the Eighth Amendment.***

> The Eighth Amendment of the United States Constitution prohibits the infliction

64

of "cruel and unusual" punishments. [Fn.24] (*In re Alva* (2004) 33 Cal.4th 254, 266.) A punishment violates the Eighth Amendment if it involves the "unnecessary and wanton infliction of pain" or if it is "grossly out of proportion to the severity of the crime." (*Gregg v. Georgia* (1976) 428 U.S. 153, 173.) When the length of a particular sentence is challenged, the appellate court considers all of the circumstances to determine if the sentence is unconstitutionally excessive. (*Graham v. Florida* (2010) 560 U.S. 48, 59.)

> [Fn.24] The guarantee of the Eighth Amendment applies to the states through the Fourteenth Amendment of the United States Constitution. (*Rhodes v. Chapman* (1981) 452 U.S. 337, 344–345.)

The United States Supreme Court has concluded that neither a 25-year-to-life sentence for stealing three golf clubs nor a 50-year-to-life sentence for stealing videotapes valued at $153 constituted cruel and unusual punishment. (*Ewing v. California* (2003) 538 U.S. 11, 30–31; *Lockyer v. Andrade* (2003) 538 U.S. 63, 77.) In the present case, by contrast, appellant committed repeated acts of sexual molestation against his own daughter, who was very young. Appellant committed these heinous acts to satisfy his own sexual desires. Doe testified that the incidents that form the basis for appellant's convictions were the ones that she remembered best, but appellant had forced her to undergo many other incidents of sex. She said that appellant put his penis in her vagina "[j]ust about" every day.

Appellant physically attacked Doe on one occasion when she resisted. He hit her arm and choked her. During the carrying incident, he physically held down her arms while having sex with her. Doe described being in pain and crying during the specific incidents of sex that she described for the jury. Appellant sometimes gave her pain pills after having sex with her.

At sentencing, the trial court noted that appellant had inflicted serious emotional distress upon Doe, he took advantage of a position of trust, and appellant showed no signs of remorse. [Fn.25] The court concluded that appellant had displayed "a high degree of cruelty, viciousness, and callousness." The court believed that appellant posed "a serious danger to society" and to Doe.

> [Fn.25] At sentencing, appellant informed the court through his attorney that he was innocent.

Given the United States Supreme Court precedent and the nature of appellant's crimes, appellant's sentence—especially as modified in this opinion—does not constitute cruel and unusual punishment under the Eighth Amendment. The totality of the circumstances does not demonstrate or even reasonably suggest that his sentence is grossly disproportionate to his conduct. (See *People v. Gomez* (2018) 30 Cal.App.5th 493, 499–500 [rejecting a similar argument in a sexual molestation case resulting in a sentence of 35 years to life].) Consequently, appellant's Eighth Amendment claim fails.

Garza, 2023 WL 415659, at *50–51.

### a.    Legal Standard and Analysis

The Eighth Amendment provides that cruel and unusual punishments shall not be

inflicted.  U.S. Const. amend. VIII.  A sentence constitutes cruel and unusual punishment if it is

1    "grossly disproportionate" to the crimes committed.  <u>Lockyer v. Andrade</u>, 538 U.S. 63, 71 (2003)

2    (holding that a California state court's affirmance of two consecutive twenty-five-years-to-life

3    sentences for petty theft was not grossly disproportionate and not contrary to nor an unreasonable

4    application of federal law); <u>see also</u> <u>Ewing v. California</u>, 538 U.S. 11 (2003) (holding that a

5    sentence of twenty-five-years-to-life for theft under California's three strikes law was not cruel

6    and unusual punishment); <u>Harmelin v. Michigan</u>, 501 U.S. 957, 961 (1991) (mandatory sentence

7    of life without possibility of parole for first offense of possession of 672 grams of cocaine did not

8    raise inference of gross disproportionality); <u>Rummel v. Estelle</u>, 445 U.S. 263, 271 (1980)

9    (mandatory life sentence imposed following defendant's third felony conviction for obtaining

10   $120.75 by false pretenses did not constitute cruel and unusual punishment).  Outside of the

11   capital punishment context, the Eighth Amendment prohibits only sentences that are extreme and

12   grossly disproportionate to the crime.  <u>United States v. Bland</u>, 961 F.2d 123, 129 (9th Cir.1992)

13   (quoting <u>Harmelin</u>, 501 U.S. at 1001).  When reviewing an Eighth Amendment claim in a federal

14   habeas corpus petition, the gross disproportionality principle is "the only relevant clearly

15   established law amenable to the 'contrary to' or 'unreasonable application of' framework" under

16   28 U.S.C. § 2254(d)(1). <u>Lockyer</u>, 538 U.S. at 73.  The "gross disproportionality rule" applies

17   "only in the 'exceedingly rare' and 'extreme' case."  <u>Lockyer</u>, 538 U.S. at 72–73; <u>Rummel</u>, 445

18   U.S. at 272.  So long as a sentence does not exceed statutory maximums, it will not be considered

19   cruel and unusual punishment under the Eighth Amendment. See <u>United States v. Mejia-Mesa</u>,

20   153 F.3d 925, 930 (9th Cir.1998); <u>United States v. McDougherty</u>, 920 F.2d 569, 576 (9th

21   Cir.1990).

22          In assessing the compliance of a non-capital sentence with the proportionality principle, a

23   reviewing court must consider "objective factors" to the extent possible.  <u>Solem</u>, 463 U.S. 277,

24   290 (1983).  Foremost among these factors are the severity of the penalty imposed and the gravity

25   of the offense.  <u>Id</u>. at 290–91.  If "a threshold comparison of the crime committed and the

26   sentence imposed leads to an inference of gross disproportionality," the reviewing court should

27   compare the sentence with sentences imposed on other criminals in the same jurisdiction and for

28   the same crime in other jurisdictions.  <u>Harmelin</u>, 501 U.S. at 1005.  "Comparisons among

offenses can be made in light of, among other things, the harm caused or threatened to the victim or society, the culpability of the offender, and the absolute magnitude of the crime." Taylor, 460 F.3d at 1098. If a comparison of the crime and the sentence does not give rise to an inference of gross disproportionality, a comparative analysis is unnecessary. Id.

The Court finds no inference of gross disproportionality from the present record. As noted by the state court, Petitioner was found guilty of numerous sexual crimes against his young daughter. Petitioner's sentence of 55 years to life plus 88 years and eight months cannot plausibly be considered grossly disproportional to his crimes, when the Supreme Court has found that a 50 years to life sentence for stealing videotapes valued at $153 did not constitute cruel and unusual punishment. As noted by the sentencing court, Petitioner remorselessly displayed "a high degree of cruelty, viciousness, and callousness." The state court determination that Petitioner's sentence did not constitute cruel and unusual punishment was not contrary to or an unreasonable application of Supreme Court precedent. The claim should be rejected.

**IV.    RECOMMENDATION**

Based on the foregoing, the Court RECOMMENDS that the Petition for Writ of Habeas Corpus be DENIED with prejudice on the merits.

This Findings and Recommendation is submitted to the United States District Court Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 304 of the Local Rules of Practice for the United States District Court, Eastern District of California. Within twenty-one (21) days after being served with a copy of this Findings and Recommendation, a party may file written objections with the Court and serve a copy on all parties. Id. The document should be captioned, "Objections to Magistrate Judge's Findings and Recommendation" and shall not exceed fifteen (15) pages, except by leave of court with good cause shown. The Court will not consider exhibits attached to the Objections. To the extent a party wishes to refer to any exhibit(s), the party should reference the exhibit in the record by its CM/ECF document and page number, when possible, or otherwise reference the exhibit with specificity. Any pages filed in excess of the fifteen (15) page limitation may be disregarded by the District Judge when reviewing these Findings and Recommendations pursuant to 28 U.S.C. § 636 (b)(1)(C). The

parties are advised that failure to file objections within the specified time may result in the waiver of rights on appeal. Wilkerson v. Wheeler, 772 F.3d 834, 838-39 (9th Cir. 2014). This recommendation is not an order that is immediately appealable to the Ninth Circuit Court of Appeals. Any notice of appeal pursuant to Rule 4(a)(1), Federal Rules of Appellate Procedure, should not be filed until entry of the District Court's judgment.

IT IS SO ORDERED.

Dated:   **May 5, 2025**                          _/s/ Sheila K. Oberto_
                                                  UNITED STATES MAGISTRATE JUDGE